[No. 997.]

L. P. DREXLER, RESPONDENT, *v.* A. J. TYRRELL AND PHILIP REESE, APPELLANTS.

MORTGAGE EXECUTED TO EVADE PAYMENT OF TAXES.—Upon a review of the testimony: *Held,* sufficient to show that the mortgage, sought by plaintiff to be foreclosed, was, at the request of the mortgagee, executed to a citizen of California for the sole purpose of preventing an assessment and of evading the payment of taxes, in the state of Nevada, upon the money at interest secured thereby. (Hawley, J., dissenting.)

IDEM—MORTGAGE VOID.—*Held,* that the mortgage in question, having been so executed at the instance and request of the mortgagee, was illegal and void.

IDEM—PAYMENT OF TAXES.—The fact that the mortgagee afterwards paid the full amount of taxes upon the money at interest secured by the

mortgage, is immaterial. The mortgage contract was void when executed, and proof that the state suffered no injury would not change the result.

IDEM—CONTRACT VITIATED BY FRAUDULENT ACTS OF PLAINTIFF.—The fraud consisted in the turpitude of the motive which influenced the mortgagee at the time of the execution of the mortgage.

DEBTS SECURED BY MORTGAGE TAXABLE.—A debt secured by mortgage is subject to taxation, although the mortgagee is indebted to an amount equal or exceeding the amount of his mortgage.

COURTS WILL NOT ENFORCE ILLEGAL CONTRACTS.—If a contract is illegal it will not be enforced by the courts in favor of the party at whose instance and for whose benefit it was entered into. Courts are as incapable of enforcing such contracts as if the act was prohibited in terms, and a penalty imposed in case of violation.

POLICY OF REVENUE LAWS—CONTRACTS OPPOSED TO IT VOID.—It is the policy of the revenue laws that all property within the state, except such as is in terms exempted, shall be taxed; and any mortgage or contract entered into for the sole purpose of placing property, otherwise taxable, beyond the operation of the revenue law, is opposed to that policy, and therefore illegal.

APPEAL from the District Court of the First Judicial District, Storey County.

The facts are stated in the opinion.

*B. C. Whitman and Lewis & Deal*, for Appellants:

I. The mortgage in this case was executed in the name of J. H. Latham for the purpose of defrauding the revenues of the State of Nevada. Upon this point there is no conflict of testimony, for Drexler's own testimony shows that to have been the object. Such being the fact, the mortgage should be held to be void. (*De Witt* v. *Brisbane*, 16 N. Y. 508; *Wheeler* v. *Russell*, 17 Mass. 258; 2 Chitty on Contracts (11th ed.), 971–976, and notes; 4 D. & E. 466; 5 Id. 242; *Bixby* v. *Moor*, 51 N. H. 402; *Roby* v. *West*, 4 Id. 285; *Coppell* v. *Hall*, 7 Wall. 542; *White* v. *Russ*, 3 Cush. 448; *Fuller* v. *Dame*, 18 Pick. 472–481; *Foster et al.* v. *Thurston*, 11 Cush. 322; 44 N. Y. 87; *Utica Ins. Co.* v. *Kip*, 8 Cow. 20; *Ritchie* v. *Smith*, 6 Manning, G. & S. 462; 2 Comp. L. 3129, 3130, 3131.)

*Stone & Hiles*, for Respondent:

I. The judgment should be affirmed, because the findings

and judgment are amply sustained by the evidence. (*Carlyon* v. *Lannan*, 4 Nev. 158; *State* v. *Yellow Jacket Silver Mining Co.*, 5 Id. 418; *Lewis* v. *Wilcox*, 6 Id. 215; *Worthing* v. *Cutts*, 6 Id. 120; *Doe* v. *Vallejo*, 29 Cal. 387; *Kimball* v. *Gearhart*, 12 Id. 48; *Cohen* v *Dupont*, 1 Sanford, 262.)

II. The mortgage and note are not void. They were not made in the name of Latham for the purpose of evading the revenue laws of the state. The testimony of plaintiff, contained in the transcript, shows that the taxes on said note were paid as demanded by the proper revenue officers of Storey county. There is nothing in the revenue laws of the state which either expressly or impliedly renders void a credit of choses in action for failure to list it for taxation. Mortgages are exempt from taxation by the statute. The debt only is taxed. (*State* v. *Earl*, 1 Nev. 394; Comp. L., vol. 2, secs. 3129, 3131.)

III. Even had there been an attempt to evade the payment of a tax on the note, there being no penalty provided by statute making the note void or the mortgage void, plaintiff could enforce them against defendants. (*Brown* v. *Duncan*, 10 Barn. & Cres. 93; *Smith* v. *Mawhood*, 14 Mees. & Welby, 452; *Johnson* v. *Hudson*, 11 East, 180; *Wetherell* v. *Jones*, 3 Barn. & Adolph. 221; *Lindsey* v. *Rutherford*, 17 B. Mon. (Ky.) 245; *Harris* v. *Runnels*, 12 How. (U. S.) 82.)

IV. The contract or transaction must, to render it void, be tainted with illegality itself; a resort to something collateral or extrinsic can not be had to render it so. Thus, if the note and mortgage are valid contracts, no subsequent evasion of payment of taxes could make them void. (*Armstrong* v. *Toler*, 11 Wheat. 258.)

V. If it be conceded that the law has been evaded, and the state defrauded of its revenue, such a defense can not be urged by appellants to defeat a debt incurred by them, which is upheld by a valid consideration, or to defeat a valid security and incident to such debt. If the state has lost any tax due it, such loss is the subject-matter of a suit between it and the taxpayer; and the evasion of such tax can not be invoked to aid another citizen to avoid an honest

debt. (*Edmunds* v. *Hildreth*, 16 Ill. 214; *Edmunds* v. *Myers*, Id. 207; *Steele* v. *Worthington*, 2 Ohio, 182; *Mohney* v. *Cook*, 26 Pa. St. 349.)

VI. The authorities cited by appellants do not sustain the defense of fraud and evasion made by them. A careful examination of them will disclose the fact that they construe and apply statutes which, either in express terms or by necessary implication, prohibit the transactions out of which the suits grew. In many of those cases the statute expressly prohibited the transaction, while in others, penalties were imposed for doing the act which constituted the essence of the litigation. In none of them was any contract pronounced void by reason of things collateral—things which did not necessarily become elements in the contract itself. In none of the cases was it held or intimated that where a statute is wholly silent concerning the transaction itself, it would be rendered invalid; nor was any shadowy ground of public policy or vague "spirit of the law" resorted to, to enable the court to pronounce them void. In this case neither a statute nor a principle of the common law can be invoked to invalidate either the debt or security.

By the Court, LEONARD, J.:

Some time prior to May 6, 1876, the defendants purchased the property described in the complaint herein, situate in Virginia City, in this state, at which time there was a mortgage thereon for ten thousand dollars, owned in fact by L. P. Drexler & Co., brokers in Virginia City, although it does not appear with certainty in whose name said note and mortgage were taken.

On the twenty-fourth day of May, 1876, at plaintiff's request, at Virginia City, defendants executed and delivered a new interest-bearing note, with mortgage upon the same property as security, to J. H. Latham, a broker and resident of San Francisco, California. The mortgage was recorded in the office of the recorder of Storey county on the same day, at the request of L. P. Drexler & Co. All the parties named, except Latham, were, at the time of the transaction, and are, residents of this state. Latham hav-

ing died in June, 1876, and his wife, Nettie M. Latham, having been appointed sole executrix of her husband's will, and named therein as the sole legatee, she, on the twenty-first day of March, 1879, and subsequent to her discharge as executrix, assigned the note and mortgage in suit to plaintiff, who brought this action to recover judgment for the amount mentioned in the note, and to foreclose the mortgage. Plaintiff obtained judgment with decree of foreclosure and sale, as prayed for in his complaint. For present purposes we shall consider the assignment by Mrs. Latham to plaintiff as valid, and that thereby the legal title to the note and mortgage was vested in him.

Defendants admit receiving the ten thousand dollars from Drexler, and that they executed the note and mortgage as before stated. They do not deny the alleged indebtedness. But among other defenses they allege in their answer that, "the sum of money for which the note and mortgage mentioned in the complaint were given, was loaned to the defendants by the plaintiff, L. P. Drexler, who is a resident of the state of Nevada; that defendants are informed and believe, and upon such information and belief allege, that the said loan was made by the said Drexler for his own benefit and profit; that the said note and the said mortgage were executed at the request of the said Drexler to one J. H. Latham, a citizen and resident of California; that as defendants are informed and believe, and so allege the fact to be, he, the said plaintiff, procured the said note and mortgage to be so executed to the said Latham, for the purpose of defrauding the revenues of the state of Nevada, and that by reason of the said note and mortgage being so executed to said Latham, the said Drexler has avoided the payment of all taxes to the state of Nevada upon said mortgage; that defendants are informed and believe, and upon such information and belief allege the fact to be, that said Latham never had any interest whatever in said note and mortgage, or in the money secured thereby, but that his name was used solely for the purpose of enabling the said plaintiff to so, as aforesaid, defraud the revenues of the state of Nevada;

that by reason of such fraud the said note and mortgage are null and void."

The court found as facts, that all the taxes, *which were due* from the plaintiff to the state upon the said note or mortgage, had been fully paid before the commencement of the action, and that said note was not made in the name of James H. Latham for the purpose of defeating taxation thereof by the state of Nevada, or of defrauding the revenue of the state, or for the purpose of defrauding the revenue of the state out of any tax due or to become due upon the mortgage securing the same.

Many typographical errors appear in the transcript, but we shall assume in support of the judgment, that the court found, also, that the mortgage was not made in the name of Latham for the purpose of defeating taxation or defrauding the revenues of the state.

The fourth assignment of error is: "That the findings of fact are contrary to law and evidence in this: that the court finds that the note and mortgage sued on were not made in the name of J. H. Latham for the purpose of defrauding the revenues of this state; whereas, all the evidence shows that such was the purpose of plaintiff."

The seventh assignment is that, "the court erred in finding that the taxes had been paid on the note and mortgage, because the evidence shows that they were not." It becomes necessary, first, to ascertain whether there was any substantial evidence to support the above findings, and especially the fourth. That we may not do injustice to the plaintiff, all the testimony in this connection will be stated.

Mr. Tyrrell, one of the defendants, testified that he had a conversation with the plaintiff at the time the mortgage was given; that plaintiff then explained to him why the mortgage was made in the name of Latham, and that "the reason given was that it would save paying taxes on the mortgage;" that plaintiff told him "he had most of his mortgages made that way, in the name of some one in California, for that purpose."

Mr. Reese, the other defendant, testified that soon after defendants purchased the property plaintiff wanted a new

note and mortgage; that he asked plaintiff why they were in the name of Latham; that plaintiff replied: "We do that to avoid paying the taxes. That is just the word, and that is about all that was said."

Plaintiff testified in rebuttal as follows:

Question. You have heard the testimony of the defendants in this case, in regard to the conversation about this note and mortgage, and the loaning of the money, and in regard to the desire to have it made in the name of James H. Latham. What occurred in those conversations that you had with them, if you had any? Answer. There was a mortgage at the time upon the property, and Mr. Reese afterwards took Mr. Cummings' place; I think Mr. Tyrrell was the one that spoke to me about the renewal; he asked me if I would have it renewed; I had the mortgage drawn up, and when he came there I think that the old mortgage was still in the name of Latham; I am not positive about it; either Mr. Reese or Mr. Tyrrell spoke about it; I think it was Mr. Tyrrell asked me about the mortgage being drawn up in that name; I told him to this effect; it was to keep the mortgage from being assessed, and the reason of that was this; it had been the duty of the recorder to estimate every fall the number, and hand them to the assessor, and sometimes there was a portion of those that had been paid; on that account it produced confusion; you yourself told me that the mortgage was not assessable; I believe the supreme court has decided to that effect; for that reason, and others, I had it put in that way.

Q. As I understand you, it was not to avoid the payment of the taxes at all; that the note itself was assessable. Did you pay the taxes on that note? A. Yes, sir; and the assessor has made his assessment every year, and we have paid as I have testified in my affidavit. It was not to avoid any taxes.

Q. It was to prevent the recorder, as you think, from interfering and taxing the mortgage, under the law; that he had no right to do that under the law? A. Yes, sir. You told me so yourself. You told me it was not assessable, and I think that the supreme court has so decided.

Q. You were then trying to prevent double taxation on the note and mortgage ? A. Yes, sir.

Q. You paid taxes upon a certain sum ? A. Yes, sir; to make it more convenient for the business.

Q. How much ? A. I think from the start I have paid on (all) the taxes on the note that were necessary; there were three interested in it. * * *

Q. It was the property of these three, held in trust for them ? A. Yes, sir.

Q. How would the assessor assess you in taxing this property ? A. Well, he has been in the habit of doing this way; has gone around to these brokers and has assessed them so much on every kind of property that belongs to them.

Q. In that assessment did you include this note ? A. Yes, sir; it was all included, all the property that belonged to the firm.

Q. You paid each assessment, each different amount ? A. Yes, sir; he comes and make an assessment of the property belonging to the firm; I think that is the way they have assessed these banks; I know it is the way that Mr. Tritle and the other brokers and the savings bank do.

Cross-examination:

Q. Do you pretend to tell me, for instance last year, that you paid taxes on this note ? A. Yes, sir; I do.

Q. Did you pay on ten thousand dollars on this note ? A. No, sir; I did not pay any individually.

Q. Who did ? A. The firm paid it.

Q. How much was your assessable property ? A. The assessor assessed it at ten thousand dollars; assessed the firm that, ten thousand dollars.

Q. Is that all you were assessed ? A. Yes, sir; I think that is the same assessment that Mr. Tritle paid.

Q. Did the firm of Drexler & Co. have only ten thousand dollars out at that time ? A. The assessor came around himself; he did not require us to make any statement at all. * * *

Q. Did you fill out any list at all, an assessment list that he gave you ? A. I think Mr. Dana attended to that part of

the business. I knew that the assessor came around. I talked to him about it. These other firms were doing the same amount of business; we were willing to pay just as they did.

     *         *         *         *         *         *

Q. Do you not know that this note was not taxed by the assessor ? A. I do not know anything of the kind.

Q. Do you know whether he did tax it or not ? A. I presume that he did; he assessed it with the balance.

Q. Did you make any report to him yourself ? The Court. Of any property at all ? A. No, sir; I did not. He just assessed as a whole the property of the firm. It has been assessed as a whole. * * *

Q. You do not know whether this note has been taxed ? A. I know it was included in the property of the firm; ten thousand dollars assessed of the firm.

Q. Do you not think that is wrong when you have a note for ten thousand dollars ? A. I know it is the universal custom all over the country. I do not think it would be fair to make me put in everything I have, when everybody else is doing different. * * *

Q. Had Drexler & Co. any securities on hand last year ? Did they have notes or mortgages ? A. No (yes), sir.

Q. To what extent? A. I can't tell you. I do not remember. I swear positively it has been taxed. The assessor assessed it, and we have paid the money on it. * * *

Q. Did you not have a large amount of property besides this note and mortgage that was taxable in this county last year ? Question objected to.

The Court. He has explained it to you just as fully as he can answer; he has stated that he had a large amount of property outside of this note, and this note is for ten thousand dollars. He made the same arrangement to pay as all the brokers, ten thousand dollars on the whole of their property; Mr. Drexler can not be supposed to have intended to defraud the government; for that reason I will sustain the objection.

Q. Didn't you have a large amount of property besides this note and mortgage that was assessable in this county

last year?   A. We had a large amount.   I told you that before.

On re-direct examination, plaintiff stated that, since the execution of the note, the assessor had not demanded of him any statement, under oath, of the property of the firm, and he did not know that any such demand had been made of the other members; that "the assessor put in the assessment; we didn't put it down; he put it in himself;" that as a member of the firm, he "had never been cited to appear before the board of equalization."

In our opinion, the testimony of plaintiff, as well as defendants, shows conclusively that the mortgage was executed to Latham solely for the purpose of evading the payment of taxes upon the money at interest secured thereby, and that such purpose was fully accomplished.   It is claimed by counsel for defendants that, " such being the facts the mortgage should be held void."

At this point it is proper to notice an argument of counsel for plaintiff.   They say: " If the amount of this note can not be recovered, and the security foreclosed, the denial of such relief is not because the debt was tainted with illegality when created, but for the subsequent omission to list it for taxation, and to pay the tax imposed on it.   If the respondent paid these taxes there could be no pretense of evasion, notwithstanding the instruments were executed to a non-resident.   The illegality consists, then, not in the making of an illegal contract, and the taking of an illegal security, but in the subsequent failure, if any such occurred, to pay the tax imposed, or in an evasion or avoidance of such tax."

We say, in reply, that if the mortgage contract was legal when executed, it is so now; that is to say, if it was legal in the beginning, and evasion of assessment and payment was an afterthought, then the *legality* of the mortgage is not affected by the subsequent misconduct.   And the testimony in relation to assessment, and payment of taxes, was wholly irrelevant and immaterial, except so far as it tended to show either that plaintiff did or did not procure it to be executed and delivered to a non-resident, for the purpose

of defrauding, or enabling him to defraud, the revenues of the state.

If, however, the mortgage contract was fraudulent and unlawful when made, it must always remain so, and proof that the state suffered no injury thereby could not change the result. "The fraud consists not in the actual injury sustained by the person intended to be injured, but in the act itself and the turpitude of the motive which influenced the party to its commission; and that which was once a fraud always remains a fraud." (*Jackson* v. *Marshall*, 3 Am. Dec. 699; *Gale* v. *Lindo*, 1 Verm. 475; *Gibbs* v. *Smith*, 115 Mass. 592; *Fowler* v. *Scully*, 72 Pa. St. 456; *Bell* v. *Leggett*, 3 Seld. 176; 1 Story on Cont., sec. 762.)

Let us now examine the testimony, with the view of ascertaining whether there is any substantial evidence that plaintiff did not procure the mortgage to be executed in the name of Latham, for the purpose and with the intent above stated.

In the first place, let it be remembered that the testimony of the defendant was plain and positive as to his declared intent. He went upon the witness stand, not to deny that he had made the statements, but to explain *why* he made them. He was fully advised by the pleadings that an explanation would be necessary. From first to last he did not pretend that he had any other object except to *avoid an assessment* of the mortgage. Had it not been for the subject of taxes, the thought of having the note and mortgage drawn in the name of a non-resident would not have entered his mind. There was no necessity of doing so for convenience in business, or for profit, outside of the matter of taxes. It must be admitted that the *natural* and *probable* result of his conduct was that he would escape assessment upon the money loaned, whether that was the *necessary* result or not. The reason first given for having the mortgage so drawn is, that he did it to prevent confusion; in brief, that the recorder, before that, had sometimes included in his abstract of unsatisfied mortgages, mortgages that had been paid; and to avoid the confusion consequent to such mistake he did as stated. Outside of the law, then, which every man is

presumed to know, he was aware, as a fact, that one of the recorder's duties would be to include his mortgage in the list to be used for assessment purposes, should it be taken in his name. To prevent the recorder from so doing would certainly and effectually prevent a possible recurrence of "confusion," but it would probably prevent assessment at the same time. But it is sufficient to say, that plaintiff had the power in himself to satisfy the mortgage just as soon as it was paid, and such would have been his duty under the statute. (Comp. L. 263, 264.) And if he obeyed the law, *his* mortgage, or the money thereby secured, would not have been taxed after satisfaction, and it would have been a matter of no moment, to him, how much "confusion" was wrought by the laches of other parties. It would not have been more laborious, or expensive, to satisfy a mortgage taken in plaintiff's name, than one in favor of a nonresident. He knew the latter would have to be satisfied when paid; and he knew that the same act would satisfy his mortgage. But he said he had other reasons; and stated that, "it was not to avoid any taxes, but it was to prevent the recorder from interfering and taxing the mortgage under the law, that he had no right to do under the law; that he was trying to prevent double taxation on the note and mortgage."

The idea conveyed is, that he supposed the note would be taxed ten thousand dollars, and the mortgage as much more, if he did not have them written in favor of a non-resident; but if so taken, that the note would be assessable, while the mortgage would not be. It is conceived, that plaintiff had no reason to think, and could not have thought, if the note and mortgage were taken in his name, that he would be required to pay taxes upon a sum in excess of the amount secured. There is no law, no decision of this or any other court, and, it is believed, no practice justifying the conclusion. Surely, if he had any just ground to fear such a result, it is because the law sanctioned it; and if that was the case, then he had no right, by the device adopted, to endeavor to escape the burden imposed. And if he really thought that the note and mortgage could each be taxed ten

thousand dollars, if they were taken in his name, and that the note would be taxable, although taken in Latham's name, why should he not have supposed that the mortgage would also be taxable if drawn in favor of Latham? If the note is taxable to plaintiff, it is because it is property owned by him within this state. If the note is his property, so is the mortgage, and from his statement, he could not have expected to avoid payment upon the mortgage as well as upon the note at last, except by deceiving the recorder and assessor in relation to the true ownership of the mortgage; and certainly, to succeed in that, he must have anticipated the same result as to the note. Because, he could not have supposed that either officer would think the note belonged to him, while the mortgage was the property of Latham, nor could it have been so. Is it not true, then, from plaintiff's own testimony, either that he could not have expected to escape taxation upon twenty thousand dollars for the ten thousand dollars loaned—and, consequently, having the note and mortgage drawn in favor of Latham was a useless effort—or that, by having them in Latham's name, he expected to escape taxation entirely? But, notwithstanding the assertion, that the mortgage was drawn to a non-resident to prevent double taxation, as stated, still, plaintiff testified that, it was not done to avoid any taxes, *because the mortgage was not assessable.* And counsel for plaintiff say in their brief: "The note is the instrument which is taxable in this state. No tax is levied on the mortgage, and no law of the state requires the holder of a mortgage to list it for taxation." Then it is said that plaintiff paid taxes on the note, consequently there was neither an attempt to evade assessment and payment, nor was either, in fact, evaded. If those things are true, then what becomes of the claim of double taxation? It can not be true that plaintiff thought the mortgage, if taken in his name, would be unassessable, and that he had it made to Latham to prevent double taxation. If it was not assessable, where was the danger that it, as well as the note, would be assessed? And what reason existed for "preventing the recorder from interfering and taxing it?" Why did he conclude that any officer would do what he had

no right to do under the law? Had he ever known an assessor, upon money at interest secured by mortgage, to require payment on two dollars when only one was loaned? He does not say so. But if he was aware of such a case, did the board of equalization refuse to do justice? And more than all, if assessor and board had been forgetful of duty, were the courts unmindful of theirs also? Those avenues of escape from unlawful burdens were open to him, as to other citizens, and he had every reason to believe they would be ample for any emergency that might arise.

Moreover, upon what authority is the conclusion based, that a note secured by a mortgage, whether to a resident or non-resident, is assessable without regard to the mortgage, and that a mortgage is not assessable? The statute gives the assessor authority to assess "money at interest secured by mortgage," and it 'also requires the recorder of the county to attend on the board of equalization, with an abstract of all unsatisfied mortgages and liens remaining on record in his office; and the board shall make use of such abstract in equalizing the assessment roll, and may require the assessor to enter any mortgage, lien, or other property not assessed upon the roll. In this respect the statute of 1861 (in force when *State* v. *Earl*, 1 Nev. 397, was decided), was the same as the existing statute when this mortgage was executed, and is like the present one. In that case this was decided: that "the tax on money at interest, secured by mortgage, is neither a tax on coin, which is taxed as tangible property; a tax on the land mortgaged, which is taxed at its value, without regard to the mortgage; nor a tax on pieces of paper, upon which the note and mortgage are written; but it is a tax on a *chose in action;* in other words, it is a tax on the right which a party has to receive or collect a certain amount of money; that all choses in action follow the person of the owner, and that this state can tax such choses in action only, as belong to its own citizens or residents, although the property mortgaged has a *situs* in this state, and the mortgage is recorded here." That is the only decision of this court justifying the belief or assertion that a mortgage is unassessable; and according to that, it is cer-

tainly just as proper to say that, the note was not taxable as that, the mortgage was not so. The right to collect the money due, by foreclosure and sale, was assessable, but neither the note nor mortgage, as such, was so. Had the note and mortgage been taken in the plaintiff's name, he would have had no right to give in the note, alone, to the assessor, without regard to the mortgage, as a "solvent debt" merely. Such debts can be assessed only to the extent that the amount due the party assessed exceeds his indebtedness of the same character. But it is not so with debts secured by mortgage. They are subject to taxation, notwithstanding the mortgagee is indebted to an amount equal or exceeding the amount of his mortgage. (Comp. L. 3129; *State* v. *National Bank*, 4 Nev. 351.) Nor would the assessor have had a right to assess the note separate from the mortgage, had they been taken in plaintiff's name.

But plaintiff also testified, that the firm was assessed each year on the note, and that they paid taxes thereon, that the mortgage was not made to Latham for the purpose of avoiding payment of any taxes. Those statements were made upon these facts: Drexler & Co. owned a large amount of property in Storey county, besides the note and mortgage in question, but what amount does not appear. Plaintiff was asked several times to state the amount, but did not do so. He made an arrangement with the assessor, that the firm should pay upon ten thousand dollars, the same as other brokers. paid on. The firm made no statement of their property, nor were they asked to do so. It does not appear that the assessor had any knowledge that the note belonged to plaintiff or the firm. When asked if he knew whether the assessor had or had not assessed the note, plaintiff stated, that he *presumed* it was assessed with the balance, "as a whole." When asked if he did not think it was wrong to pay on only ten thousand dollars, when he had a note for that sum, and a large amount of property besides, he said: "I know it is a universal custom all over the country, and I do not think it would be fair to make me put in everything I have, when everybody else is doing different." Upon those facts, it is true that he testified: "I

swear positively it (the note) has been taxed and we have paid the money on it." But we submit that the only ground for that statement was, that the firm, by an arrangement with the assessor, was assessed ten thousand dollars only, upon all their property. In other words, the assessor, in violation of his official duty, let them off by paying upon a certain sum in bulk, which was much less than the value of their property. If it is true, that the note was assessed, it is equally certain that the balance, "a large amount of property," was not assessed, and hence, that the assessment, if such it may be called, was confined to the note. How could plaintiff say, then, that the note was assessed? Only upon the theory, that the assessment of different parcels of property, as a whole, no matter how many, or how great in value, for a sum, no matter how small, is an assessment of each parcel, whether the assessor intended to assess it or not, or whether he did or did not know of its existence. That such assessment, if allowed to remain, would release a party from further payment, is undoubtedly true; but it would be no evidence that he had been assessed upon any particular piece of property, or in any proper sense had paid taxes thereon. If the arrangement between plaintiff and the assessor had been, that the firm should pay upon one hundred dollars only, could it then have been said that the note was assessed? Suppose the firm had other notes and mortgages in the same condition, say for ten thousand dollars, could plaintiff have testified that those notes, too, were assessed, except upon the theory above stated? If it is true, that an assessment like this is an assessment of every parcel, regardless of the amount of the assessment or the value of the property, then plaintiff might have escaped the difficulties encountered in stating that he had the mortgage made to Latham to avoid double taxation, by claiming that the mortgage and note were both assessed, and that he had paid upon both.

Plaintiff did not testify, that he did not intend to evade payment of taxes upon *this money at interest secured by mortgage*. He did not say he did not intend to keep *this property from being assessed*. Could he have done so?

Then why did he put himself to the trouble of placing the title in the name of a non-resident, when he knew, or ought to have known, that under the law he could not, in any event, be compelled to pay upon a sum greater than the amount loaned and secured ? Why did he, *ex industria*, by placing the mortgage to Latham upon record, notify the assessor, recorder, and board of equalization, that the mortgage was the property of a non-resident, and consequently that the right of collection was unassessable, if he was willing to pay upon as large a sum after doing so, as, under the law, he would have been required to pay upon had he pursued the natural and usual course, and taken the title in his own name ? It is plain that the plaintiff intended to prevent the recorder from putting his mortgage in the abstract of unsatisfied mortgages for assessment purposes. Had it been drawn in his name and recorded, as the present mortgage was, it would have been included in the recorder's abstract; and if the board of equalization had done their duty, the money at interest secured thereby would have been entered upon the assessment roll as property that had not been assessed. He says he did it to prevent the recorder from doing just what the law requires that officer to do. He did it to prevent such an assessment as the law declares shall be made. In one sense, it may be that, he " did not intend to avoid the payment of any taxes;" that is, he intended to pay what he was obliged to pay, but he did not intend to have the property in question assessed. The firm's assessment of their property, as a whole, under the arrangement with the assessor, is no proof that the note was assessed, or that plaintiff's intentions were to have it assessed, either at the time the mortgage was executed to Latham, or at the time the arrangement was made with the assessor.

It seems to us that plaintiff's explanations only strengthen the evidence of the defendants, that the mortgage was made to Latham for the sole purpose of evading the payment of taxes thereon, or upon the money secured thereby. Because, the mortgage was attacked for fraud, and proof was made of his declarations at the time of its execution, which, unexplained, showed the intent and purpose to have

been as claimed by defendants.   An explanation was attempted, but the result was failure, as we have endeavored to show; and inferences unfavorable to plaintiff must necessarily be drawn from such failure.   Our opinion, therefore, is, that the mortgage in question was executed to a non-resident, at the instance and request of plaintiff, for the sole purpose of preventing an assessment of the money at interest secured thereby, and of evading payment of taxes to become due to the state; that such purpose has been accomplished, and that there was no substantial evidence in the case opposed to such conclusions.

Counsel for defendants urge that those facts render the mortgage contract unlawful, and that courts must refuse to enforce it.   If counsel are correct there is no doubt that defendants may avail themselves of that defense to prevent foreclosure.   (*Fowler* v. *Scully, supra,* 468; *Blythe* v. *Lovinggood,* 2 Ired. (Law), 21; *Gaston* v. *Drake,* 14 Nev. 175.)

There are certain principles affecting this case, so well settled by a long, unbroken line of decisions, that court and counsel can not differ upon them.

Courts will not lend their aid to enforce illegal contracts or actions grounded upon immoral or illegal acts.   Every act is unlawful which the law forbids to be done, and every contract is void which contravenes the law.   (Metcalf on Contracts; 1 Story on Cont. 566; 2 Chitty on Cont. 982, note t.)

" All contracts, the object of which is to induce an omission of duty, are unlawful and void no less than those which are made for the purpose of encouraging the commission of unlawful acts."   (Metcalf, 246.)

" Agreements contravening the ends and objects of the enactments of the Legislature, or as it is most commonly expressed, the policy of those enactments, are void." (Smith's Law of Cont. 221.)

" Nor is it necessary that the contract should violate the express words of a law, for agreements contrary to the policy of statutes are equally void." (Sedg. on Const. of Stats, 69.)

" No contract can be enforced in the courts of the United

States, no matter where made or where to be executed, if it is in violation of the laws of the United States, or is in contravention of the public policy of the government or in conflict with existing treaties." (*Kennett* v. *Chambers*, 14 How. U. S. 39; *Hannay* v. *Eve*, 3 Cranch, 242.)

Contracts against the policy of bankrupt and insolvent laws are illegal and void.

"And it must be observed that a contract, although not expressly prohibited by a statute, may be illegal if opposed to the general policy and intent thereof, as if made to insure to one creditor of a bankrupt a greater share of his debt than the others can have, *or a contract made in order to enable another to infringe that policy and intent.*" (Smith's Law of Cont. 17.)

*Bell* v. *Leggett*, 3 Seld. 176, was an action upon promissory notes given by a third person to a creditor, in consideration of his withdrawing opposition to the discharge of his debtor as a bankrupt, but without the knowledge or connivance of the debtor. The notes were held to be void as against the policy of the bankrupt law. The lower court considered the arrangement wrong, but on the ground that there was no *provision* against it in the bankrupt law, it was held not to make the notes void, but the court of appeals decided that they were void as against the policy of the bankrupt law.

In *York* v. *Merritt*, 77 N. C. 214 (see facts), the Court said: "So it appears that the plaintiff was to cover up the land for the defendant, until he got his discharge in bankruptcy and then reconvey to him. This testimony discloses a transaction *contra bonos mores*, in which both parties participated. But then it was not alleged in the complaint, nor in the answer, nor was there any issue submitted to the jury, which in express terms involved it. It may, therefore, do the plaintiff injustice to assume its truth as to him; but we may assume its truth as to the turpitude of the defendant, because it is his own testimony, and being true as to him, it shows that he is not entitled to the judgment which he obtained, and, therefore, there must be a new trial. The alleged turpitude of the transaction, although

so plainly stated in the testimony, seems to have been allowed no effect whatever at the trial. If this was because such things are so common that honesty is benumbed, it ought to be the oftener declared that the courts will not aid one party to enforce a fraud against another. And that where both parties have united in a transaction to defraud another, or others, or the public, or the due administration of the law, or which is against public policy, or *contra bonos mores*, the courts will not enforce it in favor of either party."

In *Sharp* v. *Teese*, 4 Halst. (N. J.) 352, which was an action upon a promissory note given in consideration of withdrawing opposition to a discharge under the insolvent law, after stating the purposes of the law, the court said:

"Any transaction or arrangement which tends to defeat either of these purposes is inconsistent with the policy of the law. The attempt to contravene the policy of a public statute is illegal. Nor is it necessary to render it so, that the statute should contain an express prohibition of such attempt. It always contains an implied prohibition, and to such attempt the principles of the common law are invariably hostile,   *   *   *   by at all times refusing the aid of the law to carry it into effect or enforce any contract which may be the result of such transactions."

So, *Dial* v. *Hair*, 18 Ala. 798, shows that D. procured his son to enter upon and occupy certain public land for the purpose of acquiring a pre-emption right to the same, and it was agreed between them that so soon as such right was perfected, D. would pay for the land and the son should convey one half of it to him. The court said: "It may be admitted that at the time of entering into this agreement, there was no particular act upon the subject of pre-emption that declared such a contract void in express words; but if, upon a review of all the legislation of congress upon the subject, such a contract would be considered as contravening the design and policy of the laws, a court of equity would not enforce it.   *   *   *   The contract disclosed by the bill is illegal—it can not be enforced, and the chancellor erred in decreeing a specific performance." There

there was no prohibition of the contract in terms, nor was any penalty imposed by statute.   The contract was declared illegal, simply and only upon the ground, that it was entered into for the purpose of enabling the plaintiff to obtain lands, by evading the policy of the law.   The same principles are declared in *Thompson* v. *England*, 1 Hawk. L. and Eq. 137, and in *McDermed* v. *McCustland*, Hardin (Ky.), 21.   (See, also, *Glenn* v. *Mathews*, 44 Tex. 404.)

We have been thus particular in stating the law—and perhaps needlessly—in relation to contracts that are against the policy of the law, for the reason that one of the principal arguments of counsel for plaintiff is, that plaintiff omitted the performance of nothing required, and did nothing prohibited by the statute; that since the revenue law is silent upon the subject it can not be assumed that the legislature intended to visit upon plaintiff so severe a penalty as that claimed by counsel for defendants, and that it can not be held, for any reason, that the mortgage contract is illegal.

If a contract is illegal, it matters not why it is so.   When that fact is ascertained, it will not be enforced in favor of the party at whose instance and for whose benefit it was entered into.   If it is illegal, as against the policy of the law, courts are as incapable of enforcing it, and thus affirming it, as they would be if the identical act was prohibited in terms, and, in addition, a penalty was imposed in case of violation.

The constitution provides that " the legislature shall provide by law for a uniform and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation, for taxation, of all property, real, personal, and possessory, excepting," etc.   Following the constitutional requirement, the legislature passed the revenue law, entitled "An act to provide revenue for the support of the government of the state of Nevada," wherein it is provided, that " all property, of every kind and nature whatsoever, within this state, shall be subject to taxation," with certain exceptions stated; and " moneys at interest, secured by mortgage or otherwise," are made taxable.

Between certain dates the assessor is required to assess " all property subject to taxation in his county."   He is re-

quired to demand from each person, etc., a statement, under
oath or affirmation, of all his property within the county,
or claimed by him, in his possession or under his control.
Any person who refuses to make such statement, when it is
demanded, is guilty of a misdemeanor, and if he willfully
makes a false statement, under oath, "he shall be deemed
guilty of perjury." The recorder is required to furnish the
board of equalization with an abstract of unsatisfied mort-
gages and liens, for use as before stated. Recorders are
not permitted to enter satisfaction of mortgages (except for
purchase money), and courts shall stay foreclosure proceed-
ings, on motion of defendant, until affidavit is made, that
"all taxes, for county and state purposes, due or payable
on the money or debts, secured by the mortgage, have been
paid." Assessors are liable for taxes on all taxable prop-
erty which is not assessed through his willful neglect; and
if a non-assessment is caused by a refusal by the owner
* * * to give a statement to the assessor, the person
whose refusal caused the omission, "shall pay double the taxes
imposed upon the property when assessed." From the
foregoing epitome the intent and policy of the revenue law
are too plain to require a statement. They are that all
property within the state, except such as is in terms ex-
empted, shall be taxed. It must follow, that any contract,
arrangement, or device, entered into for the sole purpose of
placing property, otherwise taxable, beyond the operation of
the revenue law, is directly opposed to the only policy of
that law. And if there is one statute more than another, of
the policy of which courts should not countenance an eva-
sion, that one is the revenue law. Upon its proper and
legal enforcement the life and prosperity of the state depend;
and if one citizen escapes payment of a just portion of taxes,
the burden that he should bear must fall upon others who
are already heavy laden. It may be admitted that the legis-
lative intent did not extend beyond the object stated in the
title, to provide revenue. It is probable that they did not
stop to consider what would be the result of a studied
evasion, upon contracts entered into, in whole or part, for
that purpose. But those facts do not change the situation.

*Their* duty was to provide revenue by legal enactments; that having been done, the duty of enforcing or annulling contracts according to the facts presented, rests upon the *courts*, and if the case shows a contract violative of the principles of the common law, against statutory provisions, or the plain policy of either, it can not be enforced in favor of a guilty party. A contract may be illegal because the consideration was such, or the act to be performed is of that character; and it is said, that this mortgage is valid, because "it was based upon a lawful consideration, and no principle of public policy or good morals prohibited its creation." That it would have been legal had it been taken in plaintiff's name, there can be no doubt; but when it was executed for the purpose of contravening the revenue law, by obtaining the full benefits of the loan in this state, without bearing burdens legally imposed upon him and other citizens alike, it became illegal. To say otherwise, would be to affirm a contract entered solely for an avowed illegal purpose. The state did not establish judicial tribunals for the purpose of legalizing acts, the object and result of which are her destruction. It is idle to say that this mortgage, the instrument itself by which plaintiff intended to evade, and did evade, the law, is legal, because another, had it been given in plaintiff's name, would have been so. *This* instrument has an illegal element which can not be separated from that which, otherwise, would have been legal, and it can not be foreclosed without legalizing an illegality. Nor is there the slightest novelty in the distinction made. The books are full of cases that fully recognize it. (*Clugas* v. *Penaluna*, 4 Term. 466; *Biggs* v. *Lawrence*, 3 Id. 454; *Aiken* v. *Blaisdell*, 41 Vt. 668.) There are cases where courts have held that the contracts sued on, were, in themselves, legal, and could be enforced, although an incidental illegality occurred in carrying them into effect; such as contracts for the sale of spirits and tobacco, when the seller had failed to take out a license as required by law, and when the statute inflicted a penalty in case of non-compliance with the requirement. Those cases are cited by counsel for plaintiff in support of this mortgage. There is no similarity between

them and the one in hand.   They were decided upon the ground that the contracts sued on were in no manner tainted with illegality; that the transactions, the sales, were strictly legal, *after,* as well as *before,* the enactment requiring a license, *there having been no agreement, express, or implied, in the contracts themselves, that the law should be violated.*   For instance, in *Witherell* v. *Jones,* 3 Barn. and Adolph. 221, it is said, that "where a contract which a plaintiff seeks to enforce is expressly or impliedly forbidden by the statute or common law, no court will lend its assistance to give it effect.   But when the consideration and the matter to be performed are both legal, we are not aware that a plaintiff has ever been precluded from recovery, by an infringement of the law *not contemplated by the contract,* in the performance of something to be done on his part."

And in *Johnson* v. *Hudson,* referred to in Story's Conflict of Laws, 748, the contract was held valid, *"since the contract of sale was wholly independent of, and collateral to, the illegality."*   In those cases the contracts were for the purpose of sale only, while our contract, the mortgage, was executed for the purpose of securing the money loaned, *but also to evade the payment of taxes upon the money secured.*   The last being violative of the policy of the revenue law, and subversive of the rights of the state, was unlawful, and it tainted the whole instrument with illegality.

In *Ex parte Cohn,* 13 Nev. 426, it was held, that the statute requiring foreign insurance companies to pay a certain tax (Comp. L. 3947), was constitutional, although insurance companies incorporated under our laws were not required to pay any tax.   Now, without deciding the question (for courts are by no means agreed, 73 Pa. St. 200), let it be conceded, that a contract of insurance by a foreign company, without compliance with the law, would be valid, if made in its own name, and that both parties are bound thereby, although no tax has been paid.   Suppose, for the purpose of evading payment, and escaping the penalty, a foreign company makes an arrangement with a home company, to take risks in the name of the latter company.   The home company assigns the claim for premiums to the for-

eign company, which brings suit for their collection. We have no hesitation in saying they could not be collected, because the very contract would be based upon an intentional violation of the policy of the statute. Under the revenue law the property of widows is exempt from taxation to the extent of one thousand dollars. Suppose this mortgage had been for that sum only, and to evade payment of taxes on that money, plaintiff had caused it to be executed in the name of a widow in Storey county, and recorded, agreeing to pay her one half the amount of taxes saved by the arrangement. The money secured is not taxed, but plaintiff refuses to pay the widow. She sues and he pleads the facts. We have no doubt that courts would be obliged to refuse to enforce the claim. And we are also certain, that if she should refuse to assign the mortgage to him he could not compel her to do so. Take another case. A. lives near the border of this state and owns a band of cattle. If, for any legal purpose, he may wish to drive them into California, he can do so, and there, as here, make any lawful disposition of them, although that may result in his escaping taxation in this state. But should he, for the sole purpose of evading payment of taxes, make a colorable sale and delivery merely, he could not recover the cattle or their value. The courts would say: "You have made your bed in fraud, and so far as the law is concerned, you shall lie there."

Mr. Smith, in his Law of Contracts, page 236, puts a case which aptly illustrates the distinction, at common law, between a contract which is legal, although an incidental illegality occurs, and one which is itself illegal. He says: "Suppose, for instance, A. employs B. a builder, to repair the front of his house, and B., in so doing, erects an indictable nuisance in the public street; still, as the contract to repair the house is legal, and the erection of the nuisance in so doing *was not contemplated by the agreement,* B. might recover for the repairs which he had executed. *But it would be otherwise if it had been made part of the agreement that the repairs should be performed by means of the erection of the*

*nuisance; for there the illegality would have entered into and formed part of the contract.*"

Our opinion is, that the mortgage is illegal, because it was executed at the instance and request of plaintiff for the purpose of evading a legal duty, and in contravention of the plain policy of the revenue law. And it is equally so under the principles of the common law.

In *Blythe* v. *Lovinggood,* 2 Ired. (Law), 21, plaintiff and defendant were bidders at a public sale for a piece of land belonging to the state. It was agreed between them, that if the plaintiff would fail to comply with his bid (he was the lowest bidder), and allow the land, according to the conditions of the sale, to be taken by defendant, he (the defendant) would give him one hundred dollars. The action was upon a note given in pursuance of that agreement. Recovery was had in the lower court, but on appeal it was said: "If the plaintiff intended to comply with the terms of sale, but failed in consideration of the defendant's executing to him the note, then the conspiracy had the effect of depriving the state of so much of the purchase money as made up the difference between the two bids; and such a transaction, we think, was fraudulent towards the state. * * * It has been repeatedly decided in England, that the vendor of goods could not recover the price of the vendee, when he aided the vendee, either in packing or otherwise, to defraud the revenue laws of that country. * * * We are of the opinion that the agreement in this case was in pursuance of a fraudulent design to defraud the state of a fair price for its land, and that the plaintiff ought not to recover."

We quote also from *Curtis* v. *Perry,* 6 Ves. jun., 739*a:* "It is perfectly clear that if this is to be considered as a question between Chiswell and Nantes, the former could not be heard to say he had any interest in these ships. * * * He (Nantes) did acquire them in his own individual person, and Chiswell, to effect the purpose he had, must be understood to have agreed that Nantes should be apparently the sole owner. The reason for waiving any right Chiswell had, in consequence of the manner in which Nantes made this

purchase, was that a profit might be made by the employment of them in contracts with the government, and Chiswell was a member of parliament, who, the law says, shall not be a contractor. The moment the purpose to defeat the policy of the law, by fraudulently concealing that this was his property, is admitted, it is very clear he ought not to be heard in this court to say that it is his property."

And there is still another reason why plaintiff was not entitled to a decree of foreclosure, etc.: Although it is true that he made, and according to the letter of the statute (Comp. L. secs. 3211, 3212), could make, an affidavit, "that all taxes for county and state purposes, *due or payable* on the money or debt secured by the mortage, had been paid," because, by reason of non-assessment, there was nothing "due or payable," still, by his studied act, he intentionally produced that result, and, without paying taxes on the money or debt, made it possible to comply with the letter of the statute. He did by indirect means what he could not accomplish directly, and still be entitled to a decree. In order to obtain the benefit of notice to subsequent purchasers and mortgagees, plaintiff was compelled to place the mortgage upon record. Had it been taken in his name, either the assessor or board of equalization must have made use of it for the purpose of assessment, and no decree could have been granted until the taxes had been paid. We think with counsel for defendants that the mortgage must be held to be void.

The decree of foreclosure and sale is annulled and set aside, and the judgment is modified by striking therefrom the sum of five hundred dollars allowed as counsel fees.

HAWLEY, J., dissenting:

The testimony of Mr. Drexler presents many bad features as to the mode of assessing property in Storey county. If his testimony is true, the county assessor has failed to perform his duty; and it is apparent that, by his neglect, several persons have been enabled to evade the payment of taxes justly due to the state. The revenues of this state have thereby been defrauded. These facts, however, are

not sufficient to authorize this court to declare the mortgage in question void.

In my opinion the testimony of Mr. Drexler does not admit that the mortgage was executed in the name of a non-resident for the sole purpose of evading the payment of the taxes upon the money at interest.   He denies that such was his purpose.

In my opinion the evidence is sufficient to sustain the findings of the court below upon this question.

I dissent from the judgment declaring the mortgage void.