## BROWN, OSBORNE & CO. v. NEWELL.

1. FINDING OF FACT—EQUITY.—On appeal in chancery cases, this Court must examine all testimony to ascertain if findings of fact by the Circuit Judge are warranted thereby.

2. IBID.—TAXES—FRAUD.—This Court finds from evidence here that mortgagor did not intend to evade the taxation of his mortgage for the year 1898, reversing findings by referee and Circuit Judge.
   MR. CHIEF JUSTICE MCIVER *dissenting.*

3. MORTGAGES—FRAUD—TAXES—EQUITY.—A note and mortgage executed in favor of A., and assigned by him to B. before execution and delivery and without consideration, purporting to be executed on the day of the execution of a prior mortgage of same mortgagor to B., but in fact executed nearly a year later, the consideration of the second mortgage being the satisfaction of the first, and being properly recorded, is a valid contract between mortgagor and B., and enforceable in equity by B., and a prior lien to all after encumbrancers.
   MR. CHIEF JUSTICE MCIVER *holding* that the mortgage was taken with intent to defraud the government of taxes, and that a court of equity will not enforce it at the instance of B.

4. EVIDENCE—FRAUD—INTENT.—Other transactions of like nature are admissible as evidence to show intent on the allegation of defrauding the government of taxes by preventing assessment of choses in action.
   MR. CHIEF JUSTICE MCIVER.

5. FRAUD— TAXES— MORTGAGES— PARTIES— FORECLOSURE.— COURT OF EQUITY will not lend its aid to enforce a contract entered into with intent to defraud the government of taxes, and it makes no difference whether the defendant is in *pari delicte* or not, or whether he sets up such fraud by his pleading; and the same rule applies where both contracting parties are codefendants in foreclosure by junior mortgagee. *Cudd* v. *Williams,* 39 S. C., 492, *distinguished from this.*
   MR. CHIEF JUSTICE MCIVER.

6. MORTGAGES—FRAUD—LIEN.—A mortgagee who satisfies one mortgage and takes another in name of third person, assigned to him

before execution, for same debt, with intent to defraud the government of taxes, which second mortgage is declared illegal, cannot have the satisfied mortgage set up as a prior lien as against junior mortgagees, who took their deeds since such satisfaction. MR. CHIEF JUSTICE MCIVER.

7. REHEARING refused.

Before HUDSON, special Judge, Anderson, December, 1900.    Reversed.

Foreclosure by Brown, Osborne & Co., in their own right and as assignees of L. R. Watson, L. N. Greer, and Jos. J. Fretwell, against A. T. Newell, J. W. Hardin, Brock Bros., W. A. Neal, Bank of Anderson and J. Matt. Cooley. The issues of law and fact were referred to R. Y. H. Nance, who filed the following report, omitting formal parts and such as do not bear on the main question:

"I. I find that the defendant, A. T. Newell, on or about November 5th, 1897, executed and delivered to J. Matt. Cooley for J. W. Hardin, his certain sealed note and mortgage for $8,800, and allowed the same to be dated back to December 23d, 1896.

"II. I find that the said note and mortgage had previously been assigned by the said J. W. Hardin to the said J. Matt. Cooley for the supposed reason of indemnifying the said Hardin, in case the said Hardin would go on a bond in Abbeville County for the said J. Matt. Cooley to administer on some estate; but for reasons unknown to this Court, the said Matt. Cooley never gave any bond for any purpose with the said J. W. Hardin or any other person as surety.

"III. I find that the defendant, A. T. Newell, on the 23d day of December, 1896, executed and delivered to the defendant, J. Matt. Cooley, his certain sealed note for $8,800, and the same was secured by a mortgage of real estate.

"IV. I find that during the year 1897, the said J. Matt. Cooley, by making statements to the said Newell that he, the said Cooley, had to give a bond in Abbeville County, that it would be necessary for him, the said Cooley, to indemnify

his surety; that his surety could not qualify on said bond unless he was worth more money, and that it would be necessary for him, the said Cooley, to place some of his property in his hands in order for his surety, J. W. Hardin, to qu on said bond; he thereby induced the said Newell to execute a note and mortgage in favor of the defendant, J. W. Hardin, for $8,800, with the understanding that he, the said Cooley, would mark satisfied of record the mortgage given to him on December 23d, 1896, by the said A. T. Newell. And it appears that on or about November 5th, 1897, this agreement was carried out—that the said Cooley marked satisfied of record the said mortgage, and that the defendant, A. T. Newell, gave in lieu thereof the note and mortgage to J. W. Hardin, dated December 23, 1896; but as a matter of fact the note and mortgage were never executed until November 5th, 1897.

"V. I find that the consideration for the note and mortgage executed by the defendant, A. T. Newell, to J. W. Hardin was the marking satisfied of record the former note and mortgage executed by the said Newell to the said Cooley on December 23, 1896.

"VI. I find that the statements made by Cooley to Newell in making this transaction, were false and fraudulent, and made with the intent and purpose to defraud the State of South Carolina and the county of Anderson out of the taxes or revenue that would be due thereon. It also appears from the testimony that the said Newell knew, or at least had in his mind, at the time that this transaction was effected, that that was Cooley's scheme.

"VII. I find that the note and mortgage executed by Newell to Hardin was, as a matter of fact, never delivered to the said Hardin, in person or by agent, after the due and proper execution thereof, and that the said J. W. Hardin never had any interest therein, as the transfer was only made to indemnify him as surety on Cooley's bond, and the bond never being given by Cooley, the note and mortgage were never delivered to Hardin.

"VIII. I find that there is now due on the note and mort-
gage executed by the defendant, A. T. Newell, to J. W.
Hardin, and which was assigned to J. Matt. Cooley, princi-
pal and interest in the sum of $11,794.75, and $353.84 as
attorneys' fees, making an aggregate sum due thereon of
$12,248.58. * * *"

Conclusions of law: "I. The mortgage executed by the
defendant, Newell, to his codefendant, J. W. Hardin, and
delivered to his codefendant, J. Matt. Cooley, as assignee of
the said J. W. Hardin, is dated December 23d, 1896, but as a
matter of fact was never executed till November 5th, 1897;
as I have already stated, it was part of a scheme to defraud
the government out of its taxes. The question now arises,
'Can this mortgage be foreclosed, and the equity of redemp-
tion barred?' I think it can. While we recognize the fact
that he who comes into equity must come in with clean
hands, we see here the defendant, Newell, coming in Court
with as unclean hands as Cooley, having admitted that he
thought at the time the mortgage was executed that it was a
scheme of Cooley to defraud the government of its taxes.
He was, therefore, *in pari delicto* with Cooley; and more-
over, there can be no question that the consideration proper
of the note and mortgage was valuable, ample and wholly
untainted with fraud. The statute law of this State pro-
vides penalties for the evasion of taxes. For a court of
equity, at the request of a defaulting mortgagor, to refuse
foreclosure to aid him in evading the payment of an honest
debt, and, in effect, to impose an additional penalty upon the
delinquent taxpayer of $12,000, would be monstrous. It
would, indeed, be 'to strain at a gnat and swallow a camel,'
and, under the guise of equity, to perpetrate iniquity. The
fraud is alleged only against the State and county; and it is
hard to see how that should furnish Newell any ground for
violation of his mortgage agreement. In this connection,
the case of *Cudd* v. *Williams*, 39 S. C., page 452, is in point.
In that case, the plaintiff sought an equitable remedy, specific
performance of an agreement; the defendant alleged fraud

touching the subject matter of the agreement but not affecting the defendant, and said, as is said here, that the person seeking equitable relief did not come with clean hands.    Specific performance was, nevertheless, decreed, the Court saying: 'But if there was fraud in the prior transaction of her husband with the plaintiff, Mrs. Williams had no connection with it.    The fraud was only against Williams, and as we understand it, no such creditor is here complaining.  . If the plaintiff acquired the goods improperly, we cannot see how that should furnish Mrs. Williams an excuse for violation of her agreement to pay for them.'    The maxim of equity involved is a sound one, but the defendant, Newell, does not make out, in a manner to appeal to the good conscience of this Court, his right to invoke it; we do not consider this a proper case for its application.

"The plaintiffs do not allege fraud in their complaint, and they took their mortgage with notice of this prior mortgage on said premises; and having failed to allege fraud, they can claim no right to relief.    None of the parties to this suit have been defrauded by the actions of the defendants, Cooley or Newell, by the execution of the note and mortgage by Newell to the defendant, J. W. Hardin; the only parties that may have a cause of complaint are the State and county, and they are not before the Court.    Newell admits that he still owes said Cooley the amount stated in said mortgage, and claimed here by Cooley as assignee of Hardin, I hold the consideration good and valid, and I hold that the said mortgage is a second lien on the premises described in paragraph 3 of the complaint; it should be foreclosed and the equity of redemption barred. * * *"

The cause was heard by the Circuit Judge on exceptions by all parties except defendants Hardin, Brock Bros. and Neal.    So much of the Circuit decree as refers to the main issue is as follows:

"All exceptions to the main report raised by plaintiff and the defendants, A. T. Newell and J. Matt. Cooley, relate to

the note and mortgage purporting to have been executed by the defendant, A. T. Newell, to J. W. Hardin, and purporting to have been assigned by J. W. Hardin to J. Matt. Cooley, there being no question raised as to the amounts and priorities of the other liens set up in this case by any of the exceptions.    It is, therefore, ordered, that so much of the report of the said referee as relates to the amounts and order of priority of said liens as to each other (excluding, of course, the Hardin-Cooley mortgage), be and the same is hereby confirmed.    As to said Hardin note and mortgage set up by the defendant, J. Matt. Cooley, I find the following to be the facts:

"On December the 23d, 1896, the defendant, A. T. Newell, in consideration of money loaned him by J. Matt. Cooley, executed and delivered to said Cooley his certain note and mortgage on the real estate described in the complaint, for the sum of $8,800; that on November 5th, 1897, J. Matt. Cooley induced A. T. Newell to sign a note and mortgage to J. W. Hardin, of Abbeville County, S. C., for the amount of $8,800, on the fraudulent representation that he (Cooley) wanted Hardin to execute a guardianship bond for him in Abbeville; that this note and mortgage were dated back to December 23d, 1896, and were delivered November 12th, 1897, to J. Matt. Cooley, but never to J. W. Hardin, and as an inducement to said Newell to sign said note and mortgage, said Cooley cancelled and surrendered to Newell his note and mortgage for the same amount, of date December the 23d, 1896, and on November 12th, 1897, satisfied of record the mortgage executed by Newell to him on December 23d, 1896; that prior to the execution of the note and mortgage of Newell to Hardin, on November 5th, 1897, Cooley had procured from Hardin an assignment of the unexecuted note which he subsequently induced Newell to sign; that there was no consideration whatever for the assignment of the note, which assignment was made several days before the signing of the note and mortgage by Newell to Hardin.    I further find as a fact, that the purpose of J. Matt. Cooley in

procuring this assignment from Hardin and the subsequent execution of the note and mortgage by Newell to Hardin, which was to be in full satisfaction of the note and mortgage from the said Newell to the said J. Matt. Cooley, was in furtherance of a scheme devised by the said J. Matt. Cooley to apparently put his property beyond the jurisdiction of the taxing authorities of Anderson County, S. C., where he resided, and thereby to evade the payment of his taxes on said property, and thus to defraud the State of South Carolina and the county of Anderson out of their just revenues. I not only think that the finding of fact by the special referee in this particular is supported by the clear preponderance of the evidence, which is sufficient in civil causes, but I think the evidence supports his finding of fact in this matter beyond all reasonable doubt. Cooley's explanation of this transaction is so thoroughly unreasonable that it cannot for a moment gain credence.

"I cannot agree with the special referee in his finding of fact, that A. T. Newell knew of the real purpose of J. Matt. Cooley in substituting the mortgage taken in the name of J. W. Hardin for the one Cooley had on Newell's property, and that Newell was, therefore, a voluntary party to Cooley's unlawful scheme. I think the contrary is true. It seems from the testimony of Capt. H. H. Watkins that Newell suspected that such was Cooley's purpose, but this seems to have been a mere suspicion and nothing more. Under the view of the law entertained by me, it can make no difference in this case as to whether Newell knew or did not know of Cooley's real purpose at the time. So the fact of Newell's knowledge or the want of it is of little consequence to the real issues involved herein. The evidence shows that the Hardin transaction was not the only one of this character had by Cooley. He had at least three other transactions of the kind, where the notes and mortgages were taken in the name of one H. D. Hall, a resident of the State of Texas, when the money loaned was his own. I hold as a matter of law that the special referee did not err when he admitted testimony as to

3—64

these other transactions on the part of Cooley for the purpose of showing Cooley's scheme, and the exceptions of defendant, Cooley, imputing error to the special referee in admitting this testimony, are hereby overruled.

"I hold as a matter of law that the assignment by J. W. Hardin to J. Matt. Cooley of the unexecuted note, which was subsequently signed by Newell, was void, for the reason that at the time of the assignment there was nothing to assign—that is to say, there was no such note in existence, and Hardin certainly did not then have an assignable interest in the note which was subsequently executed. (But even if this assignment of an unexecuted note may be held to transfer the property in the note when subsequently executed, it certainly cannot be held to carry with it, as a necessary incident, the subsequently executed mortgage, on which there was no assignment endorsed.) I, therefore, hold and adjudge, that J. Matt. Cooley is not the lawful owner and holder of the note and mortgage executed by the defendant, Newell, to his codefendant, Hardin. He is, therefore, not entitled to have judgment on the note or for foreclosure of the mortgage.

"But a far more serious question for the defendants, J. Matt. Cooley and J. W. Hardin, is the one touching the illegality of the Hardin note and mortgage which Cooley, as assignee of Hardin, seeks to enforce in this suit. The contention on the behalf of the plaintiffs and the defendant, A. T. Newell, is that, inasmuch as this note and mortgage were, at the instance of Cooley, taken in the name of Hardin, a resident of Abbeville County, for the purpose of evading the payment of taxes thereon, and thus defrauding the State of South Carolina and the county of Anderson of their just and proper revenues, they were illegal, and for that reason should not be enforced by the Court. I am constrained by my view of the law to approve and affirm the correctness of this contention, and to hold that a court of equity will not lend its aid to J. Matt. Cooley to collect this mortgage debt by foreclosure. (Nor will the Court give judgment on the note, for

this would be to defeat the purpose of the law, which requires the Court, in such case, to withhold its aid from the person who seeks to enforce a debt contracted with the view of defrauding the government of its revenues by evading the payment of taxes. In support of this view, we find in Cooley on Taxation, edition of 1881, note 4, page 299, the following: 'An important principle of the common law may also be called an assistant in the collection of taxes. It is this: "That all contracts and arrangements made for the defeat or evasion of the revenue laws of a county are illegal, and the Courts will give the parties no remedy in respect to them.' " Citing numerous authorities.).

"In *Drexler* v. *Tyrrell*, 15 Nev., 114, in a very strong and well considered opinion, the Supreme Court of Nevada, in passing upon a transaction very similar in its facts to the Cooley-Hardin-Newell transaction, declared the note and mortgage illegal and void, and would not permit its enforcement. This view is also sustained by the Supreme Court of Kansas, in the case of *Sheldon* v. *Pruessner*, 22 L. R. A., 709. The Courts in the due administration of law will not enforce a contract in violation of law, or permit plaintiff to recover upon a transaction against public policy and the policy of the law, even where the invalidity or illegality of the contract or transaction is not specifically pleaded.

"Sheldon *v.* Pruessner, *supra.* In the case of *Oscanyan* v. *Winchester Repeating Arms Co.,* 103 U. S., 539, it was held: 'The illegality of the contract can be considered, although not affirmatively pleaded.' This defense is allowed not for the sake of the defendant but of the law itself. The principle is indispensable to the purity of its administration.'

"*Hall* v. *Coppell,* 7 Wall., 542: 'Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches it destroys.

The principle to be extracted from all the cases is that the law will not lend its support to a claim founded upon its violation.' Such is the language of the Court in the case of *Hall* v. *Coppell*, 7 Wall., 542. This is cited with approval in Oscanyan *v.* W. R. Arms Co., *supra.* I cannot agree with the special referee that Newell is *in pari delicto* with Cooley. Yet, if he were, under the authority of the cases cited, he could still raise the question of the illegality of the Hardin note and mortgage. Where the illegal contract is executed, the Courts will not aid a *particeps criminis* in setting it aside; but as long as the illegal contract is executory, it cannot be enforced in any kind of action brought directly upon it. The illegality constitutes an absolute defense. Pom. Eq. Jur., vol. 2, page 457, and in a note on same page, we find the law on this point admirably expressed as follows, to wit: 'It should be observed that the defense of illegality is allowed from motives of public policy rather than from a regard for the interests of the objecting party. When a person having actively participated in the illegal transaction, and having obtained all the benefit of it from the other party, refuses to perform his own executory undertaking, and sets up the illegality as a defense, his position, considered by itself, is unjust, but the law sustains it out of regard to the interests of society. The objection comes in appearance from the individual litigant, but in reality from society—the State speaking through the Courts.' Citing *Holmes* v. *Johnson,* Cowp., 341, 343, per Lord Mansfield and others, the theory of the law is that it is not lending aid to the defendant, but is simply withholding it from the plaintiff. It looks hard that Cooley should lose his money, but he has no one but himself to blame. He gave up a safe and secure investment to enter into this transaction for the evasion of the payment of taxes, and must suffer the consequences.

"It follows that all findings of fact and conclusions of law by the special referee, and all exceptions of the defendant, Cooley, inconsistent with this decree, are overruled, and all

findings of fact and conclusions of law not inconsisent with this decree are confirmed.

"It is further ordered, that the plaintiffs have leave to apply at the foot of this decree for judgment on their several demands, for foreclosure of their several mortgages, sale of the property and such other relief as may be mete and proper."

From this decree, the defendant, J. Matt. Cooley, appeals on the following exceptions, to wit:

"I. Because his Honor erred in holding that the defendant, J. Matt. Cooley, is not the lawful owner and holder of the note and mortgage executed by the defendant, A. T. Newell, in the name of J. W. Hardin, and delivered to said J. Matt. Cooley, it appearing from the testimony of said J. Matt. Cooley and J. W. Hardin that it was agreed by and between them that said note and mortgage should be executed and delivered by said A. T. Newell to said J. Matt. Cooley in the name of J. W. Hardin, to be held by said J. Matt. Cooley as his property; and it further appears that said J. Matt. Cooley furnished adequate and valuable consideration for said note and mortgage.

"(a) His Honor erred in holding that the assignment of the said note by J. W. Hardin to said Cooley was void, as it was assigned before it was actually signed by said A. T. Newell, and that said Hardin then had no assignable interest therein; whereas, he should have held that said assignment was made in pursuance of an agreement between said Cooley and said Hardin, made in contemplation of said A. T. Newell signing and delivering said note to said Cooley for his benefit.

"(b) His Honor erred in holding that even if the said assignment could be held to have transfarred the interest in said note when executed, it could not be held to carry with it as a necessary incident the subsequently executed mortgage; whereas, he should have held that when said Hardin executed said assignment of said note to said Cooley, it was contem-

plated that said mortgage should be executed and delivered by said A. T. Newell to secure the payment of said note, and that the transfer of the note carried with it said mortgage, it having been executed to secure the payment of said note.

"(c) His Honor erred in not holding that the note and mortgage having been executed and delivered to Cooley in the name of Hardin for the benefit of Cooley, with the knowledge, consent and agreement of Newell, Cooley furnishing the consideration, which was valuable and adequate. Cooley became the owner thereof upon delivery of the same by Newell, even though there had been no agreement with reference to Hardin's being surety on the administration bond, and that said assignment became operative immediately upon the signing and delivery of said note and mortgage to said Cooley by said Newell.

"(d) His Honor erred in not holding that said Cooley, having given valuable and adequate consideration to said A. T. Newell for the said note and mortgage, to wit: the former note and mortgage executed and delivered by said A. T. Newell to said Cooley, a trust resulted to said Cooley in said note and mortgage, executed by said Newell in the name of said Hardin, on their execution and delivery to said Cooley, and he then became the owner thereof by reason of having furnished said valuable consideration therefor.

"(e) His Honor erred in holding that there was no consideration for said assignment by said Hardin to said Cooley, it appearing from the evidence that said Cooley furnished adequate and valuable consideration for the execution of said note, and that said Hardin assigned it in consideration and in pursuance of an agreement between him and said Cooley, that said note and mortgage should be executed in his name for the benefit of said Cooley.

"II. His Honor erred in finding that said Cooley induced said Newell to sign said note and mortgage to said J. W. Hardin, on the fraudulent representation that he wanted said Hardin to execute a guardianship bond for him in Abbeville.

"(a) He erred in finding that such representation was

ever made, the said Cooley and said Hardin both having sworn that said note and mortgage were so executed to indemnify said Hardin as surety on an administration bond, which said Cooley contemplated giving in Abbeville County, in order to administer on the estate of one Frank Lipford, deceased, and said Cooley having sworn that he so stated to said Newell.

"III. His Honor erred in finding that said Cooley procured the execution of said note and mortgage in the name of said J. W. Hardin, and satisfied the former note and mortgage executed and delivered to him by said A. T. Newell, in furtherance of a scheme devised by him to apparently put his property beyond the jurisdiction of the taxing authorities of Anderson County, S. C., where he resided, and thereby to evade the payment of his taxes on said property, and thus to defraud the State of South Carolina and the county of Anderson of their just revenue, it appearing that the aggregate amount of the credits returned by said Cooley in the spring of 1898, after said change was made, was greater by $6,000 than it was the spring of the year 1897, when said former note and mortgage were in his name, and when J. F. Clardy swears that he exhibited them for taxation, and said Cooley having sworn that he included said Hardin-Newell note and mortgage in his returns for 1898.

"(a) His Honor erred in finding that the finding of facts of the special referee is supported by the preponderance of the evidence.

"IV. His Honor erred in holding that the Ellison note and mortgage and assignment thereof, the McCoy note and mortgage and assignment thereof, and the Keaton note and mortgage and assignment thereof, were competent evidence in this case, they being transactions between other persons.

"(b) He erred in holding these papers were part of a scheme to defraud the State and county of Anderson of taxes; these papers, amounting to only about $3,000, and it appearing that said Cooley had notes and mortgages in his

own name of the full value of over $40,000, which he included in his returns for 1898.

"(c) It is submitted that J. Matt. Cooley in the years 1897 and 1898 was indebted to his guardianship's account in the sum of $5,000 for money of his wards used by him in making the loan to Newell, and that this debt was not paid until 1900, and that in calculating the amount of credits to be assessed against him, this debt should have been deducted, and the Judge erred in not so holding.

"(d) Error in finding as fact that the Hardin transaction was not the only one of this character had by Cooley. He had at least three other transactions of the kind when the note and mortgage were taken in the name of one H. D. Hall, a resident of the State of Texas, when the money borrowed was his own.

"V. Error in overruling the master's finding of facts, that Newell knew of the real purpose of J. Matt. Cooley in substituting the mortgage taken in the name of Hardin for the former one held by Cooley; for it is submitted that if Cooley had any such purpose, the said A. T. Newell knew of the same.

"(a) Error in holding that it can make no difference whether Newell was cognizant of Cooley's alleged purpose or not, it being submitted that if Cooley's purpose was formed to evade the payment of taxes, Newell cannot take advantage thereof, if he was *particeps criminis*.

"VI. His Honor erred in holding any testimony competent on the question of said Cooley having had a Newell note and mortgage changed to the name of said J. W. Hardin, with intent to evade the assessment of same for taxation, and to defraud the State and county of Anderson out of the taxes thereon; such allegation not being a defense, neither the State nor county of Anderson being a party of this action or making any complaint as creditor or otherwise, and the transaction being good as between the parties; and the State providing no greater penalty in case of wilful false return of property for taxation than that the value of said property for

taxation should be increased fifty per cent. in the year when the owner of said property failed to return the same and twenty per cent. for previous years in which it had escaped taxation.

"VII. Even if said Cooley did procure said note and, mortgage to be changed from his name to that of said J. W. Hardin, with the intent to evade the assessment and taxation of the same, and thus to defraud the State and county of Anderson out of the taxes payable thereon, his Honor erred in holding that the said Cooley has no right to enforce the same in this action and have his debt paid out of the proceeds of the sale of said land.

"(a) He so erred because, even if it be true, that a court of equity will not lend its aid to a plaintiff's coming into Court to enforce a contract entered into in violation of law, such doctrine cannot apply to this case, because said Cooley did not come into the Court of his own accord, but was brought into Court by the plaintiffs herein; and they having brought him into Court, cannot invoke this equitable doctrine, nor can the defendant, Newell, invoke it, because Cooley is not plaintiff here, and did not voluntarily come into Court to ask its aid.

"(b) He so erred because the statutes of this State declare that the taxes on property are a debt against the person on whose property they are assessed; and being a debt, the State and county are creditors, and all other transactions are good as between the parties to the same, though entered into to defraud the person to whom some other debt is due, and is good against all the world except the person intended to be defrauded; and neither the State of South Carolina nor the county of Anderson is a party to this action, or making any complaint or claim with respect to said property or the taxes thereon.

"(c) He so erred because the statutes of this State impose no greater penalty in case of wilful failure to return property for taxation, or wilful returning it at a false valuation, than an increase of fifty per cent. of its value for taxation in

the year in which such property is first assessed and twenty per cent. increase for previous years in which it has escaped taxation; and it is submitted that the Courts cannot impose a greater penalty than the State has seen fit to impose.

"(d) It is submitted that under the statutes of South Carolina, taxpayers are not required to return specific securities owned by them, but only the aggregate of their credits, after deducting all debts owed by them; and the Judge erred in not so holding.

"(2) It is submitted that to constitute a fraud upon the tax laws of this State it is not sufficient that there should be a purpose to escape assessment of and taxation upon some specific security; but it must appear that the purpose was to escape assessment and taxation upon the aggregate of all credits, after deducting debts, this aggregate being established upon the same basis of assessment applied to other taxpayers; and the Judge erred in not so holding.

"(3) It is submitted that the evidence in this case does not show that J. Matt. Cooley ever attempted or proposed to escape taxation upon the aggregate of his credits, after deducting his debts, established upon the same basis applied to the assessment of other taxpayers; but, on the contrary, the evidence shows that after satisfying the first note and mortgage he took—the Newel note and mortgage—Cooley returned for taxation a greater amount of credits than had been fixed by the board of assessors the preceding year; and the Judge erred in not so holding.

"(4) It is submitted that even if J. Matt. Cooley's purpose in satisfying the first note and mortgage and taking the new security was to prevent the board of assessors from knowing that he was the owner of the Newell note and mortgage, and from adding that to his assessment (which we, however, deny), this would not have rendered the transaction fraudulent, unless it further appear that Cooley intended to avoid returning the aggregate of his credits after deducting his debts, established upon the same basis applicable to other taxpayers. And the Judge erred in not so holding,

and in not holding that there was no evidence of a purpose
on Cooley's part to defraud the State of its just portion of
taxes.

"VIII. It is submitted that when one security taken in
settlement of a prior collateral security is adjudged to be
tainted with vice, and void, the prior security may be en-
forced as though the latter had not been made. And the
Judge erred in not so holding, and in not applying this prin-
ciple to the facts of the case.

"(2) Inasmuch as the Circuit Judge held that the note
and mortgage first executed by Newell to Cooley were for
money borrowed, and it appearing that they were valid secu-
rities, free from fraud, it is submitted that when his Honor
held that the note and mortgage executed in the place of
these securities were fraudulent and void, he should have
held that the first note and mortgage were restored, and that
they constituted a valid lien upon said lands.

"(3) It is submitted that he erred in not holding that the
first note and mortgage constituted a valid lien upon the land
described in the complaint, and in not rendering judgment
accordingly.

"(4) It is submitted that the Judge, having held the sec-
ond note and mortgage made by Newell to be void, and that
they were made in place of the first note and mortgage, he
erred in not permitting the said first note and mortgage to be
established in this action and paid out of the proceeds of
sales.

"(5) It is submitted that under the finding of his Honor
and under the facts of this case, the first note and mortgage
were a valid lien upon the premises described in the com-
plaint, and that his Honor should have so held, and have
allowed an amendment of Cooley's answer so as to set up the
said first note and mortgage, if an amendment were neces-
sary. In failing to do this he erred.

"IX. Because, even if his Honor did not err in holding
that said Newell-Hardin note and mortgage cannot be en-
forced in this action, nor the former note and mortgage, it is

submitted that he erred in not allowing judgment for the $8,800 originally loaned by said Cooley to said Newell, with interest thereon from the next day after the same was loaned, the said Newell admitting that he had borrowed this money from said Cooley, and that it had never been paid, and it not being claimed that the transaction in which said loan was made, was for any reason invalid."

*Messrs. Shuman & Mooney, T. P. Cothran,* and *Haynsworth, Parker & Patterson,* for appellant.

*Messrs. Shuman & Mooney* cite: *Appellant is the owner of the Hardin note and mortgage:* 31 S. C., 420; 9 Rich. Eq., 303; 6 S. C., 124; 21 S. C., 385; Rich. Eq. Ca., 5; 34 Am. St. R., 184; 37 S. C., 579; 16 S. C., 214; 15 S. C., 661; 14 S. C., 112; 10 S. C., 452; 1 Perry on Trusts, 5th ed., secs. 125, 143, 130; 7 Ency., 2 ed., 110; 1 Rich. L., 286; Code, 132. *No law requiring assessment of specific evidence of indebtedness:* Rev. Stat., 228, 220, 221, 279, Acts 1897, p. 465, 292. *Newell having received valuable consideration for Hardin mortgage, cannot set up this defense without returning to Cooley his money:* 21 Pick., 253; 98 Mass., 118; 153 Mass., 534; 74 Miss., 415; 39 Vt., 9; 27 Ore., 194; 140 U. S., 234; 138 U. S., 1; 22 Pick., 253; 91 Am. Dec., 370; 60 Am. St. R., 572; 29 S. C., 72; 39 S. C., 452. *Public policy requires debtors to pay their debts:* Clark on Contracts, p. 415; 6 Am. St. R., 260; 18 Am. Dec., 389; 36 Am. St. R., 876; 1 Jones on Mtg., sec. 622. *Plaintiffs have no right to complain of Cooley's mortgage:* 14 Ency., 2 ed., 266; 57 Ark., 473; 22 S. C., 532; 54 S. C., 514; 28 S. C., 101.

*Messrs. Haynsworth, Parker & Patterson* cite: *Substituted note and mortgage are valid securities:* 1 Bish. Cr. Law., secs. 208, 740, 756; 14 Ency., 137, 138; 37 A. D., 148; 17 A. D., 439; 12 Mass., 140; 22 A. D., 603; 2 Bigelow on Frauds, 408; 176 U. S., 181; 37 N. J. E., 494; 72 N.

Y., 575; 39 S. C., 452. *Tax act does not declare contracts in contravention thereof void:* 12 How., 79; 37 L. R. A., 509; Suth. Stat. Const., sec. 336; 44 S. C., 227; 51 A. St. R., 478; Endlich on Stat., par. 457. *If new note and mortgage are void, satisfaction of original securities was without consideration, and their energy is restored:* 60 A. D., 557; 15 Ency., 932; 52 A. D., 283; 20 Ency., 744; 3 Strob. E., 330; 12 S. S., 600; 37 N. Y., 353; 36 N. Y., 520; 5 Wend., 595; 2 Gratt., 389; 56 Ark., 336; 14 Wis., 39; 33 Vt., 553; 2 Bail., 574; 5 Wend., 597; 22 Wall., 170. *And it was error not to provide payment of satisfied mortgage or preserve its lien:* 30 N. J. E., 513; 75 N. Y., 127; 9 Ency. P. & P., 327; 2 Jones on Mtg., 1439; 2 Ency. P. & P., 115-6.

*Messrs. Tribble & Prince* and *Bonham & Watkins,* contra.

*Mr. Tribble cites: Party appealing from finding of fact must show that preponderance of evidence is against such finding:* 55 S. C., 198; 58 S. C., 240. *Office of exceptions:* 44 S. C., 485; 51 S. C., 55. *In order to constitute a valid assignment, there must be a valid subject matter to assign:* 2 Ency., 2 ed., 1026, 1079, 648, notes 3, 4; 4 S. C., 23; 2 Johns. (N. Y.), 430; 1 N. & McC., 125; 1 Hill, 267; 14 Ga., 173; 3 Bib., 361; 4 Rand., 179; 6 M. & W., 200; 36 S. C., 402; 2 Ency., 2 ed., 294-250; 4 McC., 230. *Test of assignability of a paper is would it survive to the executor or administrator:* Pom. Rem. and Rem. Rights, sec. 146; 2 Ency., 2 ed., 1035. *The consideration of the Hardin note and mortgage may be attacked:* 38 S. C., 147; 6 Rich. Eq., 299. *Other transactions of like character are admissible on question of intent:* 13 Wall., 456; 20 S. C., 503; 3 Wait's Acts. and Def., 4461; 12 Pick., 307; 117 U. S., 598; 27 S. C., 97. *This fraud need not be alleged by plaintiff:* 103 U. S., 261. *Note and mortgage made to evade taxes is against public policy, and cannot be enforced in court of equity:* 1 Jones on Mtgs., secs. 618-19; 1 Pom. Eq., secs. 401-2; 22 L. R. A.,

709; 1 Chitty on Con., 11 ed., 1035; Cooley on Tax., p. 289, note 4; 11 Wheat, 258; 2 Pom. Eq., sec. 940; 132 U. S., 66; 4 Pet., 184, 189; 7 Wall., 532; Smith on Con., 3d Am. ed., 187-191; 6 Cow., 431; 20 Wend., 24; 15 Nev., 114; 15 Ency., 2 ed., 934; 111 U. S., 242; 101 U. S., 108; 2 Hills Ch., 56. *Fraud affecting the consideration avoids a bond in an action at law:* 2 Bay, 11; 1 Bay, 278; 1 N. & McC., 78; 1 McM., 335; 2 Rich., 386; 2 Bail., 118.

*Mr. Prince* cites: *A contract which proposes to violate the revenue laws is void:* 2 Par. Con., 3 ed., \*260; Bishop on Con., secs. 476, 473; 1 Sharswood's Bl. Com., 58, note 2; 1 Comp., 343; 1 Bos. & P., 551; 2 Brev., 275; 18 S. C., 583; 51 S. C., 363. *Public policy defined:* 7 C. C. A., 15; 19 Ency., 565. *Any party in interest or an amicus curae may raise question of illegality:* 15 Ency., 2 ed., 1014, 1015, 1001, 1002; 37 Neb., 891; 1 B. & P., 264; *and equity follows the law:* 66 Pa. St., 192; 47 Ark., 311; 11 Ency., 2 ed., 162, note 12; 95 Ill., 419; 2 Wils., 347. *Whether Newell knew of Cooley's purpose or not, is of no consequence:* 58 N. J. L., 627; 55 Am. St. R., 614; 23 N. J. L., 352. *Nor is Newell prevented from showing its illegality by Cooley setting up the note and mortgage as assignee of Hardin:* 1 Bay, 113, 249; 13 C. C. A., 430; 14 How., 70; 4 Pet., 184; 12 Wal., 349; 8 L. R. A., 513; 21 Ill., 152. *Cancellation of original note and mortgage was a part of the fraudulent scheme, and no part of it will now be enforced or relieved against:* 10 Vt., 344; 6 Coldw., 639; 2 N. & McC., 581. *Contracts based on immoral consideration are void:* 37 S. E. R., 931.

*Messrs. Bonham & Watkins* cite: *This case is analogous to:* 51 S. C., 58. *If contract is taken with illegal purpose, Courts will not aid the original payee or assignee:* 9 Rich. L., 262. *Loss of the debt is a just punishment to those who put their property beyond reach of tax assessors:* Cooley on Tax., ed. 1881, note 4, p. 299; 15 Nev., 114; 3 Am. Dec., 699; 1 Verm., 475; 115 Mass., 592; 72 Penn. St., 456; 3d

Seld., 176; 1 Story on Con., sec. 762; 2 Ire. L., 21; 14 Nev., 175; 22 L. R. A., 709; 1 Sharswood Bl. Com., p. 58n.; 7 Kan., 210; 15 Cal., 389; 14 Kan., 588; 103 U. S. 539; 7 Wall., 249; 3 Bos., 35; 11 Wheat, 258; 1 Smith L. C., 630, and notes; 2 Pom. Eq. Jur., 457. *Court will not consider an exception raising a question not made by the pleadings or passed on by Circuit Judge:* 54 S. C., 346.

The opinion in this case was filed January 21, 1902, but remittitur stayed on petition for rehearing until

April 18, 1902. The opinion of the Court was delivered by

MR. JUSTICE POPE. This action was begun on the 10th day of March, 1900. Its object was the foreclosure of certain mortgages on lands and personal property belonging to the defendant, A. T. Newell, which said mortgages were owned by the plaintiffs, and also to ascertain what other liens, whether by mortgage or judgment, existed as to said estate and personal property, together with the priorities of the same. Upon the coming in of the answers, an order of reference was made on the 13th June, 1900, by Judge Buchanan of all the issues of law and fact to R. Y. H. Nance, Esq., judge of probate, as special referee. After several references, beginning on the 21st September, 1900, and closing 6th October, 1900, the special referee made his report on the 11th October, 1900. To this report all parties filed exceptions. The cause came on to be heard before the Hon. J. H. Hudson, sitting as a special Judge, beginning on the 10th December, 1900, and his decree was filed on the 12th day of December, 1900. To this decree the defendant, J. Matt. Cooley, alone excepted. The appellant's exceptions allege error in the decree of the Circuit Judge both as to his findings of fact and his conclusions of law. These exceptions will not be set out here but should appear in the report of the cause. The object of the appellant, so far as his exceptions are directed against the findings of fact by the Circuit Judge,

is to obtain from this Court a careful examination of the testimony adduced at the hearing before the special referee and considered by the Circuit Judge at the hearing before him, so as to determine whether the findings of fact relating to the issue whether J. Matt. Cooley intended to defraud the State and county of Anderson out of their respective shares of the taxes assessed and to be assessed on a certain note and mortgage, executed on the 5th day of November, 1897, by A. T. Newell to J. W. Hardin, for $8,800, with interest thereon from the 23d day of December, 1896, at the rate of eight per centum payable annually, and which said note and mortgage were assigned by said J. W. Hardin to the said J. Matt. Cooley—the said Circuit Judge having held in his decree that such was Cooley's purpose. *Secondly.* Whether such testimony established such a condition of things at the time of its execution by A. T. Newell on the 5th November, 1897, that such note and mortgage were invalid in the hands of the said J. Matt. Cooley, and on account of such alleged invalidity could not support Cooley's claim as a mortgage creditor of A. T. Newell. And *thirdly.* Whether the testimony showed such a condition of things touching said note and mortgage that to enforce the same was against a sound public policy, and, therefore, the Courts of this State could not lend their aid to the collection of said note and mortgage. And the other object of these exceptions was to show that the Circuit Judge had erred in his conclusions of law attending upon and regulating the foregoing matters.

The appellant bases his right to have this Court to carefully review all this testimony upon sec. 4, of art. V., of our present Constitution, which provides as follows: "Sec. 4. The Supreme Court shall have power * * * And said Court shall have appellate jurisdiction only in cases of chancery, and in such appeals they shall review the findings of fact as well as the law * * *" This is clearly a case in chancery. The duty of this Court, therefore, is to examine carefully the testimony to ascertain that the findings of fact by the Circuit Judge are warranted

thereby. Speaking for myself, I may say that the issues of fact seek to bring to light the intention of J. Matt. Cooley to commit an actual fraud, and as was remarked by this Court in *Singleton* v. *Singleton,* 60 S. C., 231, "Fraud is a word of serious import in the law; but where the word 'actual' is placed in conjunction with it, it is far more serious." Also, it is a legal maxim, "Fraud is odious and is not presumed." The personal consequences to this defendant, J. Matt. Cooley, in addition to the stigma upon his name fixed for life by the judgment of the Courts of his country, is the loss of over $13,000, which loss would not benefit his State and county, but would alone be enjoyed by his partner in crime, if he was guilty of fraud; thereby enabling A. T. Newell, as the reward to his being a *particeps criminis* with Cooley, to pay every debt he owed, with a handsome surplus in cash.

All the findings of the Circuit Judge went to the objective point that this alleged fraud of J. Matt. Cooley was to save him from paying the sum of $69.70 to be due the State and the county of Anderson as to the tax to be collected for the year 1898 on his bond and mortgage for $8,800, and interest thereon at eight per cent. per annum from 23d December, 1896, to 1st January, 1898, as is shown by the supply act passed in 1898. See pages 823 and 824 and 842 such acts, 22 vol. of Stat. at Large. We will now proceed to consider these questions as stated by me as follows: The first question underlying this contention is: Did J. Matt. Cooley seek to perpetrate a fraud against the State of South Carolina and the county of Anderson in relation to taxes due or to become due to said State and county for the fiscal year 1898 and years subsequent thereto, by changing a note and mortgage for $8,800, executed on the 23d day of December, 1896, to one executed on the 5th November, 1897? First, it must be observed that the mortgage executed in December, 1896, was duly recorded on that day in the office of the register of mesne conveyance of and for Anderson County. Then it must be remembered that the mortgage executed on 5th November, 1897, was duly re-

corded in the office of the register of mesne conveyance for said county of Anderson, in said State, on the 12th day of November, 1897. It thus appears that this bond and mortgage were really in a condition for taxation by the State and Anderson County both in the years 1896 and 1897 and 1898. So that, independent of the motives of J. Matt. Cooley and A. T. Newell, this *chose in action* was not concealed from the taxpayers and tax officers of said State and county, for certainly by all the proofs offered at the hearing, J. Matt. Cooley knew that the board of assessors were accustomed to con the books of registration of mortgages to ascertain what property, although not returned for taxation, was liable to be taxed. Members of such board so testified at the hearing of this case. Secondly. By the mortgage executed in 1896 as well as that executed in 1897, the debt, together with the interest, were clearly set forth as identical in amount, rates of interest, and the land covered by the mortgage. The only effect of the second mortgage was to allow a judgment rendered in 1897 against A. T. Newell to obtain priority over the said mortgage executed in November 5, 1897, which judgment was not in existence in November, 1896.

But apart from these considerations, it is urged: (a) That J. Matt. Cooley represented to A. T. Newell that the change from the name of J. Matt. Cooley to that of J. W. Hardin, in both the sealed note for $8,800 and the mortgage to secure said debt, was that said Cooley wished J. W. Hardin to go upon his bond as guardian of his nieces and nephew in *Abbeville* County, S. C., when in fact he had already, in 1896, been appointed guardian of such nieces and nephew in *Anderson* County, S. C., by giving a bond in the penal sum of $40,000. This is what the said A. T. Newell *and no other witness* testifies to. But, on the contrary, the said J. W. Hardin and J. Matt. Cooley testify that such representation was not made. Negatively, J. W. Hardin so testifies, for he swears that J. Matt. Cooley told him, as his inducement to become his surety on his bond as administrator of Frank Lipford, deceased, that he had left some claims in the

hands of said Frank Lipford, who died in Abbeville County, S. C., and that in order to recover the money which Lipford in his lifetime had collected, as well as the notes and claims uncollected which he held at the time of his death, his attorney, Mr. McGowan, had assured him that said Lipford's estate was solvent, and that by taking out administration, the said J. Matt. Cooley would secure said moneys which had been collected by Lipford, as well as the uncollected claims held by Lipford as his agent. And that his said attorney also told him, in answer to his question about getting sureties to his official bond as said administrator, that by indemnifying some Abbeville man, he could get such person to go on his said bond, and that he thought of J. W. Hardin, who was a citizen of Abbeville County, and also his connection by marriage, could be gotten as such surety; also, that the bond and mortgage the said Cooley held on Newell was the paper with which he proposed to indemnify Hardin. That under this representation, the said J. W. Hardin signed the transfer of the note and mortgage, which although filled out as payable to J. W. Hardin, had not been signed by A. T. Newell, and also under the further representation that it was by this identical bond and mortgage the said J. Matt. Cooley intended to indemnify him, the said J. W. Hardin, as the surety of his administration when he was ready to execute the same; but that he would prepare a paper writing at the time he, the said J. Matt. Cooley, should have him sign his bond as administrator, showing exactly what was the purpose of the parties in the assignment of such bond and mortgage. J. Matt. Cooley, in addition to the foregoing, testified that he never called on J. W. Hardin or anybody else to sign said bond after November, 1897, for the simple reason that thereafter his attorney, McGowan, told him that the estate of Lipford was not as solvent as he first thought it was; and hence J. Matt. Cooley went no further in the matter of the proposed administration upon Lipford's estate. Now Newell testifies that J. Matt. Cooley talked to him about this matter *before No-*

*vember, 1897.* That he came to him *after J. W. Hardin had signed the paper.* That at Newell's suggestion the papers were submitted to Newell's attorneys, Messrs. Bonham and Watkins, with J. Matt. Cooley's acquiescence. That a conversation betwixt J. Matt. Cooley and said attorneys of Newell took place. That Capt. Watkins advised that the said Newell might with safety sign the papers. But it is claimed that because Newell swears one thing, and J. Matt. Cooley, with J. W. Hardin, swear another, as to whether it was an administration bond or a guardianship bond, that, therefore, it was actually a guardianship bond which Cooley said he was to have J. W. Hardin sign as his surety. I do not so view the force of the testimony. Granted that A. T. Newell swears one way and that J. Matt. Cooley swears another, one on one side and one on the opposite side, where is J. W. Hardin's testimony? He has no interest in these matters. He is unimpeached. His testimony is frank and full, and impresses me that he is telling the truth. He concurs with Cooley that it was an administration bond and not a guardianship bond he agreed in November, 1897, to sign. Besides all these things, whenever a Court can reconcile testimony, it should be done. Why may not Cooley, who was guardian for his dead brother's children, which children may have been interested in these "clock" claims along with himself, have felt that it was his duty to these children as their guardian to collect the claims in the hands of Frank Lipford at the time of his death, which could only be done through an administration upon that dead man's estate? Why may not this duty as a guardian have been talked about between J. Matt. Cooley and A. T. Newell? I can see no evidence of fraud by J. Matt. Cooley in this matter.

(b) It is suggested that the testimony discloses the fact that it was the purpose of J. Matt. Cooley to evade the payment of his taxes. (1) Certainly J. Matt. Cooley does not, nor did any other person, testify that J. Matt. Cooley ever said it was his purpose, in making this change in the mort-

gage, to avoid his duty as a taxpayer either to the State or the county of Anderson. (2) But it is claimed that the testimony as to certain facts show that such was his purpose. First. It is sought to be shown that he had a contention with the tax officers so as to justify the inference that this occasioned the purpose to avoid taxation. It is quite true that the testimony establishes the fact that in the years 1897 and 1898, the county taxing officials had J. Matt. Cooley before them because they were dissatisfied with his returns for taxation. But it is admitted that the merchants of the town of Anderson, together with *very many others,* were also brought before this county board of equalization to change their returns. Confessedly, some of the best citizens of Anderson County were required to appear before this board, with the result that their taxes were increased. It is established by the testimony of the auditor, N. C. Boleman, based upon his books of assessment, that J. Matt. Cooley was assessed for taxation as follows : for the year 1895, for personal property, *$18,000;* for the year 1896, $18,100. This was the condition of things when the county board of equalization met in February, 1897. In the interval from February, 1896, to February, 1897, the board had sent one of its members to the counties of Pickens, Greenville, Laurens and also to the office of register of mesne conveyance for Anderson County. Mr. Cooley went before the county board of equalization, and as a consequence upon all these investigations this board raised Mr. Cooley's assessment of personal property for taxation up to the sum of $21,100—just $3,000 more than the year before. Before this board was the bond and mortgage executed by A. T. Newell to J. Matt. Cooley for $8,800, and was included in the whole amount of J. Matt. Cooley's personal property assessed for taxation. In the year 1898 (February, 1898), the board of county assessors agreed with Mr. Cooley that they would appoint a committee of three of their body, and that if he would bring his choses in action before them, they would arrange the sum upon which he was to pay taxes. This committee consisted of J. D. Maxwell

(pp. 87-99), J. F. Clardy (pp. 68 to 82), and J. Thomas Ashley (pp. 82, 83, 84). It is important to notice the testimony of these gentlemen carefully, to see if the new bond and mortgage executed by A. T. Newell to J. W. Hardin was included in the assessment made of J. Matt. Cooley's property for taxation in February, 1898. J. Matt. Cooley swears that it was so included, and that it was entered upon the list of his securities to be taxed on that occasion by at least two members of this committee. The members of this committee admit that two of their number did make *lists* of Cooley's property in order to fix a just assessment thereof. J. D. Maxwell swears that he made a complete list of these securities, principal and interest, and so does Mr. J. F. Clardy. These lists they could not produce, although these gentlemen carefully sought for them. The members of this committee agree that Mr. Cooley brought before them, some say twenty-five or thirty and some thirty or forty mortgages and other papers, a list of which Mr. Maxwell testifies occupied one full page of legal cap and a part of a second page. This committee, singly or combined, cannot recall by name more than three of those mortgages. This they admitted when examined by defendant Cooley's counsel on this point. The three members of this committee, when asked if J. Matt. Cooley did show this bond and mortgage in February, 1898, stated as follows: J. D. Maxwell says in his testimony: "I don't swear to the J. W. Hardin mortgage because I do not remember it. I did not see it, as I remember;" but he says, *"They might have been on the list,"* at page 90. Mr. Clardy also had a "list" of these securities offered at the hearing before the said committee. He admits that his attention was called to the satisfaction of the first mortgage (that recorded in 1896), but he cannot remember that the new mortgage (that recorded November 12, 1897), was called to his attention; but it is a fact that he could not recall but two or three mortgages on his "list" of such securities, and he could not produce such list. He said, on page 92, "Now, in the return of 1898, we made a return for him; we did that *by his exhibit*

*by taking a per centage."* The return of Mr. Cooley for the year 1898 was raised from $21,100 to $27,100; two-thirds of $8,800 and $704, the interest amounted to $6,333. This latter amount added to the former return of $21,100, makes for the taxation of Mr. Cooley's personal property in 1898 a little over $27,100. That is the return of 1897, $21,100 plus $6,166 added thereto. The other member of this committee was J. Thomas Ashley. At page 82 of his testimony, he testified in answer to the question, "Why did the committee meet with Mr. Cooley?" "Well, they were not satisfied with his return, and they made agreement with him if he would fetch up all his papers and make a true return (and appointed a committee to meet with him), that they would take his papers just as he would fetch them up." He also testified: "If the Hardin (the mortgage of November, 1897,) mortgage was in the batch of papers presented by Mr. Cooley, I don't recollect it; *in fact, I don't recollect of reading the names of them.* There was a batch of them, but I don't recollect hearing any of the name of Hardin. Had a big batch of them, and *I do not remember what was in it."* This witness testified he only remembered the Kelly mortgage, upon which the committee counted the interest close up; "but I think that day (February, 1898,) the rest were taken at what Mr. Cooley said was the value of them. In the assessment of two-thirds of the value, I think it run up about $27,000, as well as I recollect" * * "I didn't take any notes of it all; *I could not say whether the Martin (Hardin) paper was there or not,* but I don't recollect ever hearing it named." He further said there may have been twenty-five or thirty. "They (the committee) took them one by one and struck up *the value that Mr. Cooley said,* and made up his tax return accordingly." In passing upon this part of the contention it will be observed that these three gentlemen from the county board of assessors do not swear that the bond and mortgage of J. W. Hardin was not before them; they fail to remember it, and one of them says it may have been. They were speaking over three years after the

assessments; they have lost the lists they then prepared of
Mr. Cooley's choses in action; they fail to recall any of such
sureties except about three out of possibly the number of
forty of such papers.   On the other hand, Mr. Cooley swears
positively that he carried the Hardin bond and mortgage
before the committee, and *that it was included* in the return
which the committee prepared with his assistance in Febru-
ary, 1898.   Besides, one of the committee in his testimony
states that Mr. Cooley removed from the county of Ander-
son to the county of Greenville in the year 1899.   I cannot
find in these matters any evidence that Mr. Cooley formed
any purpose in the year 1898 to evade the payment of his
taxes.   The note and mortgage of A. T. Newell was exe-
cuted on November 5th, in the year 1897, some months
before the assessors raised his return from $21,100 to
$27,100, which was in February, 1898.

Second. It is sought to show that Mr. Cooley had formed
the fraudulent purpose to avoid taxation by this new mort-
gage, executed 5th November, 1897, by showing what he did
in three other instances of loans made during the year 1898,
to wit: Mrs. Lou. T. Keaton, who borrowed $1,600 on 19th
February, 1898; Miles E. Ellison, who borrowed $1,200 on
7th October, 1898; G. B. McCoy, who borrowed $425 in the
year 1894, and also a small sum in 1898, say $200, aggre-
gating $625.   Let us again examine the testimony referring
to these transactions in their order.   Mrs. Keaton in her tes-
timony states that Mr. Cooley agreed to lend her $1,600;
that she received the money from and executed the papers
under the supervision of Col. Brown, as the attorney for Mr.
Cooley, and that Mr. Cooley was not present when she re-
ceived the money and executed the papers.   That several
weeks after the 19th February, 1898, Mr. Cooley called to
see her, and told her that the papers she had executed to him
were unrecorded and that he wished her to change them to
Mr. Hall, and that Col. Brown would fix the papers.   She
did as requested, first consulting Col. Brown as to the pro-
priety and legality of such a step.   Subsequently she paid the

money to Col. Brown, as attorney for Mr. Cooley, without Mr. Cooley's presence or knowledge. Mr. Miles E. Ellison borrowed $1,200 from Mr. Cooley; Mr. Ellison received the money from and executed the paper to Col. Brown, as attorney for Mr. Cooley, and in the absence of Mr. Cooley in both instances. The papers were produced and showed that the note and mortgage were made payable to H. D. Hall, but by him assigned to Mr. Cooley. Assignment to Mr. Cooley by H. D. Hall of the note and mortgage was upon the note when executed. Subsequently, on or about April, 1899, Cooley asked him to execute note and mortgage to himself, but he paid the debt in April, 1899. The witness borrowed in the year 1899 $500 from Mr. Cooley, executing note and mortgage to Mr. Cooley himself. These papers were produced. The last mortgage was paid up in April, 1900. Mr. G. B. McCoy (p. 67) borrowed $425 from Mr. Cooley in the year 1894. That in the year 1898 he wished Mr. Cooley to lend him a little more money, and Mr. Cooley agreed that he should have it. Mr. McCoy suggested that it be added to the old mortgage, but Mr. Cooley would not agree to that plan, telling him to execute a new mortgage, directing him to go to his attorney, Col. Joseph N. Brown, which he did. That Col. Brown had him to execute a note to Hall, which was assigned by Mr. Hall to Mr. Cooley when he signed it. This new note and mortgage is unpaid, but was not presented at the trial. What does Mr. Cooley's side of the controversy present in reply? First, Mr. Cooley himself swears that it was H. D. Hall's money that he loaned to these three persons—Mrs. Keaton, Mr. Ellison and Mr. McCoy. That he and "Bud" Hall had been partners in some ventures. That he had loaned this money by the direction of "Bud" Hall, whose initials were "H. D.," *i. e.,* "Hiram David." When Hiram D. Hall was in this State on a visit from his home in Texas on 20th March, 1898, plaintiff and defendant, Newell, proved by their witness that Hiram D. Hall executed several blank assignments under his hand and seal and placed them in the hands of Mr. Cooley.

By this testimony parties in adverse interest to Mr. Cooley have proved business relations between Hall and Cooley. Very soon after business relations were established, we find Mr. Cooley agreeing to lend Mrs. Lou. T. Keaton $1,600. He (Mr. C.) sends her to his attorney at Anderson C. H., Col. Joseph N. Brown, to have Col. Brown draw the papers and pay her the money. Col. Brown drew the note and mortgage to Mr. Cooley. Soon thereafter Mr. Cooley finds that the papers are drawn directly to him, and as it was the money of H. D. Hall (see page 49), which was loaned to Mrs. Keaton, Mr. Cooley went to Mrs. Keaton and requested her to have the note and mortgage changed to H. D. Hall. This was done but not in his presence, but that of Col. Brown as his attorney. As to the Ellison mortgage, Mr. Cooley testifies that it was Mr. H. D. Hall's money (see page 49). Col. Brown, as his attorney, drew the note and mortgage payable to H. D. Hall but assigned to him (Cooley). These transactions occurred on the 7th October, 1898. As to the G. B. McCoy note and mortgage, Mr. Cooley loaned to McCoy in the year 1894, $425, taking the note and mortgage in his own name; but in May of the year 1898, McCoy needed $200 more. Mr. Cooley had him to execute a new note and mortgage to include both amounts; this was done through his attorney, Col. Brown—the note and mortgage both drawn in favor of H. D. Hall, but assigned when made by H. D. Hall to Mr. Cooley. All these things were done in the absence of Mr. Cooley, but he testifies that he loaned McCoy some money, but in effect that he was not present when mortgage was executed, and that to him personally McCoy has paid no money thereon. The fact is, that it was paid to Mr. B. F. Mauldin, as cashier of the Bank of Anderson, S. C., and deposited to Mr. Cooley's credit in that bank. At pages 135 and 136 of the "Case," Mr. J. A. Brock, who is president of the Bank of Anderson, testified for the plaintiff and Mr. Newell, that he could not say it was Mr. Cooley's custom to lend money on notes assigned to him. He may have had some transactions of that kind, but it was not the

rule. He, witness, did not have any of such blank notes left with him; Col. Brown arranged those papers. If I filled out notes for him, it was not of that kind. I don't know whether Mr. Cooley's name was printed on it, but they were perhaps in blank and filled out to him, or may have been printed. *He had a few notes* of that kind that had been transferred to him; "I don't know when the transfer was made, after or before or when it was made." Question: "Was it printed on these there, the transfer at the bottom of the paper, transfer to J. Matt. Cooley?" Answer: "He had a few notes of that character in his package, but it was not the rule. The rule was to have a different kind of blank notes entirely, payable to him directly." The plaintiffs, by their own witness, Miles Ellison, proved that in the year 1899, Mr. Cooley himself took Miles Ellison's note for $500, secured by a mortgage of real estate, in his own name. This note and mortgage were produced at the hearing. The plaintiffs and the defendant proved only three notes and mortgages made to D. H. Hall and assigned to J. Matt. Cooley, aggregating $3,400. Now, can it be inferred that the taking these three mortgages in Hall's name was to escape taxation? Mr. Cooley testified that *in the year 1898* he took two mortgages of real estate in his own name, Wulburn and another at Calhoun Mills. I do not think so. The testimony impresses me as follows: That Mr. Cooley was lending some money for Hiram D. Hall, and that to ear-mark the same, he took them in the said Hall's name, taking the precaution to have the same assigned by the said Hall to him, Cooley, so that it should be in his (Cooley's) power to overlook the same, with the intent to protect Hall's interests. The plaintiff proved by Hall's father that H. D. Hall came to Anderson County in March, 1898; that H. D. Hall and J. Matt. Cooley were together at the time; that H. D. Hall made the assignment in blank to Cooley in the presence of witnesses. Mr. Cooley testifies that he and Hall had business ventures together. Plaintiffs' witness, A. J. Hall, proved that his own son, H. D. Hall, had been in business with Cooley for

three years before the latter went to the State of Texas. Under these circumstances, is it not reasonable to conclude that Cooley told the truth when he said the money was H. D. Hall's? It seems so to me. Certainly, it is abundantly proved that it was not Cooley's custom or "system" to take notes and mortgages payable to H. D. Hall. It is suggested, however, that it was not necessary to take such three notes and mortgages payable to H. D. Hall and then as a part of the same transaction, to have Hall assign them to Mr. Cooley. That is quite true; but it must be borne in mind that Cooley was lending Hall's money while Hall was residing in another and distant State, and that by this means Cooley could manage Hall's business without the necessity of a power of attorney to collect money and satisfy the mortgages when paid. Besides these considerations, every one of these transactions were conducted by a highly respectable attorney, Col. Joseph N. Brown. The *choses in action* were kept in the vault of a well managed bank. Perfect freedom of access to these choses was accorded Mr. J. A. Brock and Mr. B. F. Mauldin, as president and cashier, respectively, of the Bank of Anderson. Mr. Cooley certainly enjoyed the entire confidence of the officers of this bank as well as that of his attorney, Col. Brown. No higher evidence of this could be furnished than the freedom of those officers and that attorney, which is shown by the facts that Col. Brown had these officers to turn over to him, in the absence of Mr. Cooley, choses in action, collecting the whole amount due thereon, without Mr. Cooley's knowledge, and placing to his (Cooley's) credit the proceeds of such collection. Also collecting interest thereon. It is in proof that Col. Brown was the attorney for Mr. Cooley in taking all three of these mortgages. It will be presumed therefrom that Col. Brown would be no party to a fraud on the State and county of Anderson; his character is unimpeached and unimpeachable. Again, it is brought in evidence by the plaintiffs and the defendant, Mr. Newell, that J. Matt. Cooley was guardian of his nieces and nephews, and the record of his settlement as

such guardian *is put in evidence by them.* Pursue those papers, and it is impossible to arise from such an examination without being convinced that here is a guardian who is careful, accurate and honorable. The estate in his hands as such guardian, of 1st January, 1897, was $24,662.08. In April, 1900, when settled, it had been increased, after paying to his wards over $1,000 each year, to the sum of *$27,937.92!* He is credited with only $210.31 as commissions. Then, too, in that return for final settlement, it will be observed how careful the guardian was to show what interest he obtained each year on such set of notes. In every day life, to learn a man's character for uprightness, it is important to observe how that man deals with others, as well as to observe how he is treated by others in business. From these considerations, though briefly stated, I cannot conclude that J. Matt. Cooley was guilty of a fraud upon his State and county nor upon any of its people. I have not overlooked the testimony of J. Matt. Cooley, where he gives the opposing attorneys trouble in seeking for information as to his knowledge of his private business. These attorneys had the right to subject him to a rigid scrutiny by cross-examination, but if he could not remember the details of the transactions several years after such transactions transpired, it is not only his misfortune but that of *nearly every witness* examined in this cause. Notably in the matter of H. D. Hall's initials. The plaintiffs' own witness proved that Mr. Cooley always called Mr. D. Hall "Bud," as well as the fact that *nearly everybody else did it, likewise.* Mr. Cooley as a witness gave every fact necessary to identify the particular Hall for whom he loaned money in these instances. So, also, as to the money loaned and the securities taken, he would never lend himself to a knowledge of facts in relation thereto with which he was not personally cognizant; those matters were attended to by others for him and in his absence, hence his inability to describe them. I have not been assisted in the examination of this testimony by the reasons actuating the conclusions of the referee, the Circuit Judge and Chief Justice McIver,

for the conclusions reached by the special master, the Circuit Judge or the learned Chief Justice of this Court on these matters are not given. The master says: "The testimony taken in this case is voluminous and in many respects very contradictory, but I have carefully noticed the manner of each and every witness while on the stand, and after considering thoroughly the testimony and weighing the able arguments by the counsel on each side, and considering the law submitted by them, I find the following facts and conclusions of law." The *Circuit Judge,* when he sustains the master, says: "I not only think that the finding of fact by the special referee in this particular is supported by the clear preponderance of the evidence, which is sufficient in civil causes, but I think the evidence supports his finding of fact in this matter beyond all reasonable doubt. Cooley's explanation of this transaction is so thoroughly unreasonable that it cannot for a moment gain evidence." *Chief Justice McIver,* in his opinion in this case, says: "Before proceeding to the consideration of the several questions, the solution of which will determine this case, it may be as well for us to say that, so far as the several questions of fact are concerned, we agree with the Circuit Judge in the conclusions and we do not think it would serve any useful purpose for us to discuss these questions in this opinion, as such a discussion would extend this opinion to an unreasonable length. But we desire to say that a careful examination of the voluminous testimony set out in the 'Case' has satisfied us that the conclusions of fact reached by the Circuit Judge are fully supported by the preponderance of the evidence, and in every instance except one (if, indeed, that be an exception,) are in accordance with the findings of fact by the referee * * *"

2. Was the note and mortgage executed by A. T. Newell to J. W. Hardin on 5th November, 1897, for $8,800, which was assigned by said J. W. Hardin to J. Matt. Cooley at the time of the execution by Newell to Hardin, such a valid obligation as could be enforced by Cooley in this action? When the facts of this contention are inves-

tigated, the following results are made to appear, to wit: On the 23d day of December; 1896, one A. T. Newell borrowed of J. Matt. Cooley the sum of $8,800 in cash; for this debt Newell executed his sealed note of that date, whereby he bound himself to pay J. Matt. Cooley the said sum of $8,800 one day after the date thereof, with interest at eight per cent. from date to be computed and paid annually. That on said 23d day of December, 1896, the said A. T. Newell, in order to secure the payment of said sum of $8,800, and the eight per cent. interest thereon, executed to J. Matt. Cooley, his heirs and assigns forever, a deed by way of a mortgage upon nearly 900 acres of land in Anderson County, in the State of South Carolina. That at the time of the execution of those papers, the said J. Matt. Cooley delivered to the said A. T. Newell his agreement, under his hand and seal, whereby he, the said J. Matt. Cooley, obligated himself to continue said loan as long as the said A. T. Newell paid on this debt the sum of $1,000 each year, but that if said sum of $1,000 was not so paid each year, the whole amount should become due. That the said A. T. Newell did not and has not paid any of such debt and interest. That on the 5th day of November, 1897, the said A. T. Newell made a new mortgage and a new note, whereby the said A. T. Newell secured the payment of the sum of $8,800, with interest thereon at eight per cent. per annum, payable annually from the 23d day of December, 1896, unto J. W. Hardin; but that at the date, to wit: 5th day of November, 1897, the said note and mortgage had been already assigned unto J. Matt. Cooley by the said J. W. Hardin, under his hand and seal, which said assignment was actually upon the sealed note to be signed by A. T. Newell. That the parties, Newell and Cooley, had previously agreed to such arrangement. That Newell was allowed to consult his attorney in regard to the same, and was advised by his said attorney that the same was a safe business transaction. That Newell delivered to J. Matt. Cooley said new note and mortgage in the presence of two witnesses. That the consideration furnished to said Newell by said Cooley was the

satisfaction of the note and mortgage executed by Newell to
Cooley on 23d December, 1896, and also the execution *by
Cooley* of his agreement under his hand and seal to and with
Newell, that if Newell would pay $1,000 each year, the said
Cooley bound himself not to exact payment of the note and
mortgage according to their terms. The mortgage was re-
corded the 12th December, 1897, and the satisfaction of the
mortgage, that of 1896, was made the same day. The
referee found that this was a valid arrangement. The Cir-
cuit Judge did not so find. Chief Justice McIver, in his
opinion, agrees with the Circuit Judge. I agree with the
referee. Clearly, the plaintiff and the Bank of Anderson
were notified by the recording of the mortgage that this
mortgage was a subsisting obligation and a prior lien at the
time they took their liens on these lands. It often happens
that A. executes his mortgage to B. when only a liability as
surety by B. to A. exists, and the mortgage being intended to
save the surety harmless, enures to the protection of the
holder of the note. The surety never pays such liability, yet
the record of the mortgage is held good against all subse-
quent encumbrances. This is done when B., the surety, does
not actually assign the mortgage to the creditor. Equity
steps in and enforces the right of the creditor. Really, one
of the beauties of equity jurisprudence is its power of adap-
tability to all the circumstances of a transaction. In this
instance, J. Matt. Cooley was induced to estop himself from
claiming his admitted prior lien by deed in the form of a
mortgage on these lands by receiving the mortgage of
Newell, by deed executed on 5th November, 1897, to Hardin,
assigned by said Hardin to Cooley prior to said execution,
which said assignment was acted upon by both Cooley and
Newell as a valid deed, and on account of such consideration
so furnished to Newell by Cooley, the latter surrendered his
good note and mortgage. I will state that plaintiffs and de-
fendant, Newell, and the other defendants in interest as
opposed to Cooley, rely upon the following satisfaction of the
mortgage of 1896 made by Cooley: "Satisfied in full, this

the 12th day of November, 1897; attested by John C. Wat-
kins, as clerk of the Court, and signed by J. Matt. Cooley."
Now this satisfaction is not by *deed*. The mortgage was a
deed. To be legally cancelled and satisfied and its lien de-
stroyed, Cooley should have made a deed to that effect. Yet
Cooley is estopped by his representation of satisfaction en-
tered on the records of the office of register of mesne convey-
ance for Anderson County. The doctrine of estoppel is
involved in this action in a court of equity, where the plain-
tiffs and defendants other than Cooley seek to retain the
satisfaction of the mortgage by Cooley. It is an equity they
have against Cooley; but has not Cooley an equity against
them also? Those who ask equity must do equity them-
selves. Has not Cooley, under this rule, the right to demand
of them that the satisfaction of his lien under the mortgage
of 1896 shall be construed along with the mortgage of 1897,
which was a consideration for such satisfaction? It seems
so to me; and when so construed, the note and mortgege of
1897 form an actionable demand enforceable as a prior lien
as against all the plaintiffs and defendants except as to the
judgment in the case of A. T. Newell against W. A. Neal
for certain costs.

These conclusions render it unnecessary to consider the
third ground of exception which may be stated, that where
the object of a contract has in it as an essential part thereof,
to evade the payment of taxes by one of the parties, that it
invalidates the whole contract. I remark, that the consider-
ation of the question here stated is rendered unnecessary by
my previous finding of fact, that J. Matt. Cooley and A. T.
Newell's contract had no object or intention to evade the pay-
ment of taxes by J. Matt. Cooley on the note and mortgage
executed by A. T. Newell to J. W. Hardin on 5th November,
1897, and the Circuit Judge is in error as to the same.

It is the judgment of this Court, that the judgment of the
Circuit Court be modified as herein required, and in accord-
ance with the recommendations of the special referee or
master, it is ordered and adjudged, that the lands and per-

5—64

sonal property be ordered to be sold, at such time, place and terms as the Circuit Court of Common Pleas for Anderson County may order; provided, that the proceeds of the sale of the lands of A. T. Newell described in the pleadings shall be applied as follows: *first,* to the costs and expenses of this action; *second,* to the payment of the judgment in the case of A. T. Newell against W. A. Neal; *third,* to the payment of the note and mortgage held by J. Matt. Cooley as fixed by the special master or referee in his report; *fourth,* to the plaintiffs as holders of the third, fourth and fifth liens on said lands, as found in the report of the special master or referee; *fifth,* to the claim of Brock Brothers as the sixth lien on said lands; and *sixth and last,* to the judgment of the Bank of Anderson. Also, it is adjudged that the personal property when sold, after payment of its costs of sale, be applied to the claims of the plaintiffs, as recommended by the special master or referee in his report.

Messrs. Justices Gary and Jones *concur in the result.*

Mr. Chief Justice McIver *dissenting.* This action was commenced on the 10th March, 1900, for the purpose of foreclosing certain mortgages, both upon real and personal property held by plaintiffs against the defendant, A. T. Newell. The other defendants were made parties, under the allegation that each of them claimed to have some interest in the real estate covered by the mortgages held by the plaintiffs. All of the defendants except W. A. Neal, who was made a formal party, as a judgment creditor, referred to in the complaint, for the costs of certain officers of the Court, enrolled in his name, answered, setting up their respective claims as liens, either by judgment or mortgage, upon the real estate covered by the mortgages held by the plaintiffs; the defendant, J. W. Hardin, however, after setting forth his connection with the subject matter of the suit, as will be hereinafter stated, alleging that he had no further interest in the premises described in the complaint, demanded that, as

to him, the complaint be dismissed, with costs. Upon hearing the pleadings, an order was granted, that it be referred to a referee to ascertain and report the amount due on the debts secured by the several mortgages held by the plaintiffs, as well as any other liens that may be established hereunder against the mortgaged premises of A. T. Newell, one of the defendants, and their respective priorities. It was further ordered, that the referee hear and determine all the issues of law and fact raised by the pleadings, and that he report his conclusions, together with the testimony taken upon such issues, to the Court. In pursuance of this order, the referee took a large amount of testimony, which is set out in the "Case," and on the 11th day of October, 1900, filed his report, a copy of which is set out in the "Case," which will be incorporated by the Reporter in his report of this case. To this report the plaintiffs as well as the defendants, A. T. Newell, the Bank of Anderson and J. Matt. Cooley, excepted, and the case was heard by his Honor, J. H. Hudson, sitting as special Judge, upon said report and exceptions, who subsequently filed his decree and judgment, bearing date the 12th of December, 1900, a copy of which is set out in the "Case." From this judgment the defendant, J. Matt. Cooley, alone appeals—basing his appeal upon numerous exceptions set out in the record. A copy of the judgment of the Circuit Judge, together with the exceptions thereto, will be included in the report of this case by the Reporter.

We do not propose to consider these exceptions *seriatim*, but will consider what we understand to be the questions raised thereby, which may be substantially stated as follows: 1st. Whether the fact that the mortgage given by the defendant, Newell, to the defendant, Hardin, was a part of a scheme devised by the appellant, Cooley, to evade the payment of his taxes due to the State and the county of Anderson, rendered it incapable of being enforced in this action against the said Newell. 2d. If so, whether the appellant, Cooley, is entitled to enforce either his note or the mortgage given to secure the payment of said note by the defendant,

Newell, to the appellant, Cooley, on the 23d of December, 1896, in this action, after the said note had been cancelled and given up by the said Cooley to the said Newell, and after the said mortgage had been marked *satisfied* on the record. 3d. Whether the appellant, Cooley, is the legal owner and holder of the above mentioned note and mortgage given by Newell to Hardin. These, as we understand it, are the controlling questions in this case, though there are other subordinate questions, which will be considered in connection with the general questions stated above.

Before proceeding to the consideration of the several questions, the solution of which will determine this case, it may be as well for us to say that, so far as the several questions of fact are concerned, we agree with the Circuit Judge in the conclusions which he reached, and we do not think it would serve any useful purpose for us to discuss these questions in this opinion, as such a discussion would extend the opinion to an unreasonable length. But we desire to say that a careful examination of the voluminous testimony set out in the "Case" has satisfied us that the conclusions of fact reached by the Circuit Judge are fully supported by the preponderance of the evidence, and in every instance except one (if, indeed, that be an exception), are in accordance with the findings of fact by the referee; for the referee, in speaking of the transaction whereby Cooley induced Newell to execute his note and mortgage to Hardin by "false and fraudulent" representations, "made with the intent and purpose to defraud the State of South Carolina and the county of Anderson out of the taxes or revenue that would be due thereon," says that Newell "knew, or at least had in his mind at the time that this transaction was effected, that that was Cooley's scheme;" while the Circuit Judge says that he does not think that Newell *knew* but only *suspected* that Cooley's purpose was, in making this transaction, to evade the payment of his taxes. Our own view of this particular matter, based upon a careful examination of the testimony, is that Newell did have a strong suspicion that Coo-

ley's object, in persuading him to make this transaction, was
to evade the payment of his taxes; yet, being at the time
indebted to Cooley in quite a large sum of money, he was
afraid to offend his creditor by thwarting his scheme, and,
therefore, he reluctantly, as the testimony shows, did enter
into the transaction.   But, as we shall presently show, it
makes no difference whether Newell knowingly participated
in Cooley's fraudulent scheme or not, so far as the present
inquiry is concerned.

In connection with the questions of fact, we will next con-
sider the admissibility of certain testimony received over the
objection of appellant, to wit: the testimony as to other
transactions of a similar kind with McCoy, Ellison
and Keaton, claimed to be for the same fraudulent
purpose on the part of the appellant, Cooley, to evade
the payment of his taxes.    The ruling of the Circuit Judge
upon this point is fully sustained by the authorities.    In
*Castle* v. *Bullard,* 23 How. (U. S.), at page 186, it is said:
"Decided cases have established the doctrine that cases
of fraud like the present are among the well-recognized ex-
ceptions to the general rule, that other wrongful acts of the
defendant are not admissible in evidence on the trial of the
particular charge immediately involved in the issue.    Simi-
lar fraudulent acts are admissible in cases of this description,
if committed at or about the same time, and when the same
motive may reasonably be supposed to exist, with a view to
establish the intent of the defendant in respect to the matters
charged against him in the declaration."    To the same
effect, see *Lincoln* v. *Claflin,* 7 Wallace, 132, and *Butler* v.
*Watkins,* 13 Wallace, where, at page 464, it is said: "Actual
fraud is always attended by an intent to defraud, and the
intent may be shown by any evidence that has a tendency to
persuade the mind of its existence.    Hence, in actions for
fraud, large latitude is always given to the admission of evi-
dence.    If a motive exists prompting to a particular line
of conduct, and it be shown that in pursuing that line a
defendant has deceived and defrauded one person, it may

justly be inferred that similar conduct towards another at about the same time and in relation to a like subject, was actuated by the same spirit." Now, the testimony in question tended to show that the appellant had, in transactions with McCoy, Ellison and Keaton, resorted to similar devices to evade the payment of his taxes, the name of one Hall being used instead of that of Hardin, as in this case. We do not think, therefore, that there was any error on the part of the Circuit Judge in holding this testimony admissible.

Coming, then, to the consideration of the first question above stated—the most important question in the case—the testimony leaves no reasonable doubt that the appellant, Cooley, being the owner and holder of a valid note and mortgage to secure the payment of a large sum of money, executed by the defendant, Newell, on the 23d of December, 1896, induced his debtor, Newell, by "false and fraudulent" representations, to sign another note and mortgage to the defendant, Hardin, for the same amount, and purporting to have been executed on the same day, though the undisputed fact is that such last mentioned note and mortgage were not signed by Newell until the 5th day of November, 1897, and were never, in fact, delivered to the said Hardin; as the undisputed fact is that Newell never owed Hardin a single cent of money. The testimony abundantly shows that the sole purpose of this transaction was to enable Cooley, who was a resident and taxpayer of the county of Anderson, to evade the payment of his taxes, by putting this much of his choses in action in the name of Hardin, who was a non-resident of Anderson County, and thus evade the payment of taxes thereon, just as he had done with others of his choses in action by putting them in the name of Hall, who was also a non-resident. So that the practical inquiry presented by the facts of this case is whether a court of equity will lend its aid in the enforcement of a contract entered into for such a purpose, by allowing the appellant to set up the note and mortgage given by Newell to Hardin, of which the appellant claims to be the assignee, as

a prior lien on the premises covered by the mortgages held by the plaintiffs. Both reason and authority require that this question should be answered in the negative. In Cooley on Taxation, 299, in note 4, that eminent author, in speaking of the various modes provided for the enforcement of the payment of taxes, uses this language: "An important principle of the common law may also be called an assistant to the collection of taxes. It is this: that all contracts and arrangements made for the defeat or evasion of the revenue laws of a country are illegal, and the Courts will give the parties no remedy in respect to them." Citing a number of cases to support this principle. So, also, in 2 Pom. Eq. Jur., sec. 940: "The proposition is universal that no action arises in equity or at law from an illegal contract; no suit can be maintained for its specific performance, or to recover the property agreed to be sold or delivered, or the money agreed to be paid, or damages for its violation." Again, in sec. 935 of the same volume, it is said: "If a contract does unduly interfere with governmental function, or with the relations of the citizen towards his own government in any of its departments, whether the interference be direct or indirect, such agreement is illegal, whatever form it may have assumed." It is only necessary to cite some of the cases to show that these fundamental general principles have been recognized and applied in actual practice to such transactions when brought before the Courts. In *Oscanyan* v. *Arms Company,* 103 U. S., 261, the plaintiff, who was the consul general of the Turkish government, resident here, brought an action against the defendant company, who was engaged in the manufacture of fire-arms, to enforce a contract with the defendant, whereby he was to receive a large sum of money for the use of his influence in favor of the defendant company in inducing an agent of said government to purchase arms from said company; and it was held that such a contract could not be enforced in the Courts of the United States. The plaintiff in error claimed a reversal of the judgment below in favor of the defendant, upon three

grounds—the first of which, involving a question of practice not pertinent to the present inquiry, need not be stated or considered. The second ground was that the illegality of the contract not having been pleaded as a defense, could not be considered; and the third ground was that the Court below erred in holding that the contract was illegal. In considering the second ground, it was held that the fact that the illegality of the contract had not been pleaded, was of no consequence. Mr. Justice Field, in delivering the opinion of the Court, says: "The objection to the recovery (based upon the illegality of the contract) could not be obviated or waived by any system of pleading, or even by the express stipulation of the parties. It was one which the Court itself was bound to raise in the interest of the due administration of justice. The Court will not listen to claims founded upon services rendered in violation of common decency, public morality or the law;" and quotes with approval the following language used by Mr. Justice Swayne, in delivering the opinion of the Court in *Coppell* v. *Hall,* 7 Wall., 542: "The defense is allowed not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration." See, also, to the same effect, the case of *Sheldon* v. *Pruessner,* 22 Lawy. Rep. Ann., 709—a Kansas case—in which the facts are very much like the facts in the present case. In the head notes of that case, prepared by Horton, C. J., who delivered the opinion of the Court, the points decided (so far as they affect our present inquiry) are stated as follows: "The Courts in the due administration of justice will not enforce a contract in violation of law, or permit a plaintiff to recover upon a transaction against public policy, even if the invalidity of the contract or transaction be not specially pleaded. Where a mortgagee, residing in this State, owns and has in his possession a note for $1,700, secured by a mortgage upon real estate in this State, and pretends to transfer by merely indorsing his name thereon, but without actually delivering the same, such note and mortgage, to his father in another State,

without any demand being made upon him to do so, to secure $450 and interest for prior borrowed money, but really for the purpose of evading the payment of taxes justly due the State. *Held,* that in an action brought in the name of the father to recover upon the note and mortgage, the mortgagee, on account of his acts in evading the payment of taxes, and thereby defrauding the revenues of the State, cannot have any recovery in the name of his father or otherwise on any part of the note or mortgage belonging to him. *Held,* also, that if the father did not have any knowledge of such alleged transfer, and his name is used to collect such note and mortgage without his consent, or if he merely accepted the note and mortgage as a *particeps criminis* to defraud the revenue laws, no recovery of any amount thereon can be had in his name." In view of this language of the Chief Justice, as well as the language he uses and the authorities which he cites in the body of his opinion, we do not think the suggestion made in the note appended to that case, as reported in that very valuable publication, Lawyers Reports, annotated, to the effect that certain points appear to have been left open, is warranted by anything that appears in the case. On the contrary, it seems to us that a careful reading of the case will show that it is a decision directly in point, in the present case; and while not binding upon us as authority, is worthy of high consideration, and is in conformity to the general principles laid down by standard text-writers, from whom we have quoted above. So, also, the case of *Drexler* v. *Tyrrell,* 15 Nev., 114, cited by the Circuit Judge in his decree, seems to be very much like the present case, and to sustain the view which we have adopted; but as the writer of this opinion has not, at present, access to that case, we do not rest our conclusions upon it, especially as it is stated in the argument of counsel for appellant to have been "severally criticized" by Mr. Jones in his work on Mortgages. Our own case of *Gist* v. *Telegraph Co.,* 45 S. C., 344, in which it was held that a person engaged in the purchase or sale of cotton for future delivery—"dealing in futures," as it is compre-

hensively termed—has no cause of action for failure to deliver promptly a telegraphic message relating to such a dealing because it was in violation of law, rests upon the same general principle which controls the present case. The case of *Fairly* v. *Wappoo Mills,* 44 S. C., 227, which has been cited to sustain appellant's contention, is very different from the present case. In that case, the plaintiff brought an action to recover his commissions as a broker upon the sale of certain goods of the defendant, and one of the defenses set up to the action was that the plaintiff had not procured a license as broker, as required by one of the ordinances of the city of Charleston. The defense was not allowed, because there was no provision in the statute authorizing the city council to pass such an ordinance, making it unlawful for a person to engage in any business for which a license may be required, and, therefore, the plaintiff's cause of action was not based upon and did not grow out of any illegal act. Without going over the reasoning of the Court in that case, which extends from the last paragraph on page 250 to page 256, it is very obvious from what is there said that the Court expressly conceded, "that if the law requiring a license actually and in terms declares that the business in question is unlawful unless the requirement of a license is complied with, then the carrying on of the business without such license is prohibited, and a contract made under it cannot be enforced in a court of justice," or even if "the statute does not *in express terms* declare the act unlawful or prohibit the carrying on of the business in question without a license, yet if it appears from a consideration of the terms of the legislation in question that the legislative intent was to declare the act unlawful, or to prohibit the carrying on of the business without a license, then no contract in pursuance of such business can be enforced." It is very obvious from this language, as well as from a full consideration of all the views presented in the opinion of the Court, that the case of Fairly *v.* Wappoo Mills lends no support whatever to the contention of appellant; but, on the contrary, expressly recognizes the

principle upon which we rest our decision in this case, and that the Court rested its decision in that case, so far as the point now under consideration is concerned, upon the ground that such principle was not applicable to that case, for the reason that neither the statute authorizing the city council to impose a license tax nor the ordinance passed in pursuance of such authority contained any provision indicating any legislative intent to make it unlawful for a broker to carry on his business without a license; but was simply intended to be a mode of raising a revenue for the city—a tax, pure and simple—and that the penalty imposed was designed simply for the purpose of affording the means of enforcing the payment of such tax, and not for the purpose of declaring it unlawful to carry on the business without a license. For, on the contrary, the terms of the ordinance plainly recognized the right of a person to carry on the business of a broker without a license—at least, for a part of each year.

It is contended, however, by the appellant, that the defendant, Newell, being in *pari delicto* with the appellant, Cooley, cannot avail himself of this defense to the claim of the appellant. In the first place, we do not think that the testimony shows that Newell was in *pari delicto*. The most that can be said is that he knew of the illegal and fraudulent purpose of the appellant in inducing him, by false and fraudulent representation, to give the note and mortgage to Hardin, of which the appellant is seeking to avail himself in this case by setting it up as a prior lien on the premises covered by the mortgages held by the plaintiffs; but it has been held in the case of *Wallace* v. *Lark,* 12 S. C., 576, and in the authorities cited in that case, that *mere knowledge* of the fraudulent and illegal purpose for which a contract has been entered into by another, is not sufficient to defeat an action on such contract. There must be something more—something to indicate an intent to aid or promote the fraudulent or illegal purpose; and of this there is no evidence to indicate such an intent on the part of Newell. But even if Newell was in *pari delicto* with Cooley, that would not affect the

question. The defense is not allowed for the benefit of the defendant, but solely in the interests of public justice, and to preserve the purity of the administration of the law. As is said by Mr. Justice Field, in the case of Oscanyan *v.* Arms Company, *supra:* "The defense is allowed not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration." And again, in the same case, in speaking of this defense, he says: "It was one which the Court itself was bound to raise in the interest of the due administration of justice." The following cases, which are cited with approval in our own case of *Milhous* v.: *Sally,* 43 S. C., 318, are to the same effect. In *Holman* v. *Johnson,* 1 Comp., 341, Ld. Mansfield said: "The objection that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but is founded in general principles of policy, which the defendant has the advantage of, contrary to real justice as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this, *ex dolo malo non oritur actio.*" No Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. And as is said by Dixon, C. J., in *Clemens* v. *Clemens,* 28 Wisc., 637 (9 Am. Rep., at page 531), after making the above quotation from Lord Mansfield: " 'The principle or policy of the law, therefore, is to reject the suit of and reprove the plaintiff for his wrong, not to reward the defendant. The plaintiff must be punished, even though it be at the expense of allowing the defendant, an equally guilty party, to obtain most unjust and unfair advantage for himself. * * * The suit of the party compelled to seek the aid of the Courts in order to obtain the fruits of his own fraud or wrong, must be dismissed, although it may result in unjustly giving to the other equally culpable party the entire benefit of them.' See, also, to the same effect, 1 Pom. Eq. Jur., sec. 401." These authorities, as well as many others which might be cited, fully establish the wise and salutary doctrine,

that where the parties enter into a contract for a fraudulent, immoral or illegal purpose, the court of equity will refuse to lend its aid to either party, but will leave the parties as it finds them. If the contract is executory, it will not enforce it; and if it is executed, it will not relieve the party from its effects.

It is quite true, that the appellant has not brought his action to foreclose the Hardin mortgage, of which he claims to be the assignee; but that is of no consequence, for a court of equity takes but little note of how the parties may be arrayed against each other, whether as plaintiffs or defendants; and where, as in this case, the appellant, though arrayed as a defendant in this case, asks that such mortgage may be established as a prior lien upon the property of his codefendant, the Court must necessarily determine the question as to the validity of his claim, just as if the appellant had by a direct action against the defendant, Newell, invoked the aid of the Court to enforce his alleged mortgage; and more especially will it do so when the establishment of such claim would be detrimental to, if not destructive of, the interests of the plaintiffs in this action.

We proceed next to the consideration of the third general question stated above—that is, whether the appellant can, in this action, set up and enforce his original note and mortgage, executed by the defendant, Newell, on the 23d of December, 1896. We do not think so, for several reasons. In the first place, the appellant when called in as a defendant in this case, under the allegation in the complaint "that plaintiffs are informed that J. Matt. Cooley claims some interest in the premises, but in what way it does not appear by record," the said Cooley was bound to show by his pleading and by the evidence what was the nature of his claim and the amount thereof, so that his claim might be adjudicated in this case; and when, by his answer, he set up the Hardin mortgage, basing his claim exclusively upon that mortgage, of which he alleged that he was the assignee, without even intimating that he held any other claim, it is too late

now, when he finds that there is danger of his losing his claim by reason of fraud and illegality, to fall back upon his original claim, which has been cancelled and extinguished by the surrender of the note which he originally held against Newell and by his voluntary entry of satisfaction upon the record of the mortgage originally held by Cooley. But again, even if the appellant had set up his original note and mortgage in his answer as the evidence of his claim, he would have been met with the conclusive answer, "You cannot establish any such claim, as you have, by your own voluntary act, extinguished such claim by the voluntary surrender of the note and the entry of satisfaction upon the record of the mortgage, more especially as this was done for the purpose of enabling you to commit a fraud upon the government." Certainly, the original mortgage cannot be set up as a lien prior to the mortgages held by the plaintiffs; for when those mortgages were taken, the record showed that the original mortgage had been satisfied—the satisfaction having been entered on the 12th of November, 1897, and all the mortgages held by plaintiffs were taken subsequent to that date; and it would be a fraud upon the plaintiffs to allow the appellant now to set up the original mortgage as a prior lien. Whether the appellant is entitled to judgment against the defendant, Newell, for the amount of money mentioned in the original note, is a question which does not properly arise in this case, as no such question is presented by the pleadings. Such a question can more properly arise in an action brought by appellant against the said Newell for money borrowed; and as to that question, we do not now propose to express any opinion.

Under the view which we have taken, the third general question—whether the appellant is the legal owner of the note and mortgage given by Newell to Hardin—becomes immaterial. We may say, however, that we agree with the Circuit Judge that appellant cannot be regarded as the legal owner of those papers. The testimony shows that the appellant, by false and fraudulent represen-

tations, induced Newell to sign that note and mortgage to Hardin, and that there was no consideration whatever moving between Newell and Hardin, as Newell never owed Hardin a cent of money on any account whatsoever; that the note and mortgage were never, in fact, delivered to Hardin, and that the note was signed by Newell after the assignment indorsed upon the blank note was signed by Hardin. Under these facts, the conclusion seems inevitable that Hardin was a mere figure-head, and that he never was, in fact, the legal owner of either the note or mortgage; that he never had an assignable interest in the note and mortgage, and that his formal assignment amounted to nothing. But, as we have seen, Cooley, even if he could be regarded as the legal owner of the note and mortgage, could not establish this claim, and, therefore, this question is immaterial in this case.

Finally, we propose to notice two positions taken by the appellant's counsel in their argument, inadvertently omitted at their appropriate place. The first is, that even if Cooley intended to evade the payment of the taxes justly due by him and by inducing Newell to sign the mortgage to Hardin, yet such intention, if not carried into effect, would not be sufficient to render such mortgage void. In the first place, there is testimony tending to show that Cooley did, in fact, accomplish the purpose designed, by escaping the payment of taxes on a portion of his personal property, designated in the tax laws as "Credits." But as there is no specific finding of fact to that effect, we will pass that by and consider the position taken by the appellant, as if the fact were that the appellant did not succeed in accomplishing the fraudulent purpose he intended, of evading the payment of his taxes. It may be true, that where a person merely conceives in his mind a fraudulent or illegal act, the law will not and cannot take any notice of such naked intention until it ripened into some act calculated to aid or promote his fraudulent or illegal design; but where, as in this case, a person not only conceives a fraudulent or illegal purpose but does some act in furtherance of such illegal or fraudulent purpose, the

law will take notice of such act, prompted by and colored with such purpose, even though the purpose may not be fully accomplished.    Here the undoubted fact is, as found both by the referee and the Circuit Judge, that Cooley not only conceived the design of evading the full payment of his taxes, but also did an act, by entering into a contract designed to aid in the accomplishment of his illegal purpose, which thereby became tainted with the same illegal character, and hence not enforcible in a court of justice.

Again, it is urged by the appellant that the State and the county of Anderson are the only parties which Cooley intended to defraud by his illegal act, and as they are not parties to this action and are not complaining, the doctrine above stated cannot be applied here.    This position ignores the well settled doctrine established by the authorities, that the Court declines to aid in a case like this, not because it is asked to do so by the party defrauded, but solely, in the interests of public justice, and, as is said in one of the cases above cited, the Court itself is bound by its own motion to raise the question in the interest of the due administration of public justice.

The case of *Cudd* v. *Williams,* 39 S. C., 452, cited by counsel for appellant, and also relied upon by the referee, is in no way inconsistent with the view which we have taken. In that case, it appeared that one T. A. Williams (the husband of the defendant, S. B. Williams), a merchant in Spartanburg, becoming embarrassed and threatened with suit, sold his entire stock of good to Cudd & Roberts.    Subsequently, the said Cudd & Roberts sold a half interest in the stock of goods to the defendant, S. B. Williams, and in an action to recover from her the purchase money of such half interest, she set up, as one of her defenses, that the transaction between Cudd & Roberts and her husband, T. A. Williams, was fraudulent and designed to defraud the creditors of T. A. Williams.    Both the Circuit Judge and the Supreme Court held that there was no sufficient evidence of fraud in the prior transaction between the plaintiffs and T.

A. Williams. This Court also said: "Mrs. Williams received the goods as her own property, and why should she not be made to pay for them, according to contract? But if there was fraud in the prior transaction of her husband with the plaintiffs, Mrs. Williams had no connection with it. The fraud alleged was only against the creditors of Williams, and, as we understand it, no such creditor is here complaining. If the plaintiffs acquired the goods improperly, we cannot see how that should furnish Mrs. Williams an excuse for the violation of her agreement to pay for them." It is obvious that this case, properly understood, furnished no support for appellant's position. The true theory of that case is that even if there was fraud in the prior transaction between the plaintiffs and the husband, T. A. Williams, the wife, S. B. Williams, had no connection with that transaction, but was sued upon an *independent* contract, not involved in or connected with the prior transaction, and not tainted with any fraud. In citing that case, the appellant loses sight of the principle laid down in the case of *Dent* v. *Ferguson,* 122 U. S., at pp. 66-7, in the following language: "A new contract founded on a new and independent consideration, although in relation to property respecting which there had been unlawful or fraudulent transactions between the parties, will be dealt with by the courts on its own merits. If the new contract be fair and lawful and the new consideration be valid and adequate, it will be enforced." That was the real principle which controlled the case of Cudd *v.* Williams, and was properly applicable to that case; but it is not applicable to the present case; for here there was no new contract founded on a new and independent consideration, not itself tainted with fraud, but the contract which the Court refuses to enforce was itself tainted with fraud, having been entered into for the sole purpose of defrauding the revenue.

For the foregoing reasons I am unable to concur in the conclusions reached by the majority of this Court.

6—64

On petition for rehearing, the following order was filed April 18, 1902:

On examination of this petition, it fails to satisfy us that any material fact or principle of law has either been overlooked or disregarded, hence there is no ground for a rehearing.

It is, therefore, ordered, that the petition be dismissed and the stay of remittitur heretofore granted be revoked.